(No. 62683—

FRANK M. WANLESS, Appellant, v. RHONDA
ROTHBALLER *et al.*, Appellees.

*Opinion filed December 19, 1986.—Rehearing
denied January 30, 1987.*

160

RYAN, J., took no part.
GOLDENHERSH, J., dissenting.

Heyl, Royster, Voelker & Allen, of Peoria (Lyle W. Allen, Gary D. Nelson, and Elizabeth W. Christensen, of counsel), for appellant.

Ross E. Morris, of Lewiston, for appellees.

JUSTICE SIMON delivered the opinion of the court:

Frank Wanless, the plaintiff, brought this action for libel against defendants, Rhonda Rothballer and the Peoria Journal Star (Journal Star). A jury in the circuit court of Peoria County returned a verdict for the plaintiff and assessed compensatory and punitive damages totaling $500,000. The appellate court reversed the judgments, holding upon its *de novo* review that there was insufficient evidence in the record to convincingly establish the presence of "actual malice," as required in cases such as this where the allegedly libeled party is a public official. (136 Ill. App. 3d 321.) The plaintiff was allowed leave to appeal (94 Ill. 2d R. 315(a)), and he requests this court to consider whether the appellate court utilized the proper standard of review and, if so, whether the record discloses clear and convincing evidence of actual malice.

The plaintiff was village attorney for the village of Morton at the time defendants published the allegedly libelous articles in the January 20, 1977, edition of the Journal Star. On that date, defendants published three stories regarding the plaintiff's conduct as village attorney in the years 1972 through 1976, and those stories completed a series of articles investigating allegations of unethical conduct by Morton village officials.

The lead article on a single page of three articles regarding the plaintiff was headlined "Annexing to Morton

... Village Atty. Wanless Paid By Clients, Taxpayers." It began: "Village Atty. Frank M. Wanless has been paid twice for preparing annexation papers—by the village and by clients wishing to annex to the village." There is evidence that the village of Morton had a policy that any landowner whose property was contiguous with village boundaries could petition for annexation and be annexed upon payment of a fee to the village. Landowners would have to prepare the necessary documents at their own expense, and during his tenure as village attorney, the plaintiff was paid many times to prepare annexation papers in his capacity as a private attorney. The plaintiff testified that he prepared those papers three or four times a year, and only in cases where the village's annexation fee had already been established. He further testified that attorneys who prepared annexation papers rarely attended meetings of the Morton board of trustees where such petitions were acted upon by majority vote; none of those who testified could recall a case where a properly drafted petition to annex contiguous land had been denied.

For discharging the duties of village attorney the plaintiff was paid $1,500 every month by the village as a retainer for 60 hours of legal work per month. The village was billed an additional hourly charge for every hour worked in excess of 60 hours in one month; if in any one month the plaintiff devoted fewer than 60 hours to village work, the difference was credited against time in excess of 60 hours expended in other months. About twice a year the plaintiff would submit a bill to the village for the balance of additional hours worked in the previous half year. Rothballer described how she came to the conclusion that Wanless had been paid twice for the same work:

> "During the interview with the Plaintiff on October 29, 1976[,] he admitted that he would prepare annexation

> papers for private individuals when all the rules of annexation were laid down. Based upon these statements to me that the Plaintiff represented private individuals with legal matters which required action by the Board of Trustees of the Village of Morton, by whom the Plaintiff was paid a retainer fee to act as Attorney for said Village, I concluded that the Plaintiff was paid by both his private clients and by the Village of Morton for preparing annexation papers."

The evidence shows that the plaintiff was not retained to prepare, in the sense of drafting, annexation papers for the board of trustees; rather, as set forth above, village policy required landowners to bear that expense. By vote of the village trustees, that policy was reaffirmed in the spring of 1976. Rothballer wrote in the published article that "[m]any cities pay the attorneys' fees connected with annexation" while Morton policy was to not do so, indicating that she knew that annexing parties were expected to pay attorney fees. Although there was no evidence presented at trial to support the assertion that the plaintiff billed the village (by counting hours against the 60 hours covered by his retainer or counting hours as extra hours) for time spent actually drafting annexation papers, neither was evidence presented to negate the presumption that the plaintiff was paid by the village for his attendance at board meetings where the board of trustees considered or acted upon annexation petitions he had prepared.

Plaintiff's second allegation of libel arises from comments in the same article suggesting that the plaintiff had prepared a sewer-assessment ordinance which benefited his alleged client, WRCL Company, owner of the Waldheim subdivision.

> "At a public hearing in August 1975 for a special assessment sewer project on N. Morton Ave., where Waldheim is located, Wanless said he was the attorney for the subdivision's development company known as WRCL

Co.

So, he was representing [village of Morton] Trustee Zobrist [a partner in WRCL Company] in his annexation request, as well as representing the village. He also was preparing the special assessment project that would affect his client Zobrist, and future subdivision dwellers.

***

Once that [sewer trunk line] was furnished, the individual lots were assessed for the remainder of the sewer project costs. The entire sewer system for the subdivision was provided without any cost to WRCL Co."

Defendants' representation that the plaintiff drafted all village ordinances pertaining to the sewer-assessment project affecting the Waldheim subdivision was accurate, but there was no public hearing during August 1975 where the plaintiff might have said he was WRCL Company's attorney. The plaintiff denied that he had ever made such a statement, and defendants were unable to identify their source for that allegation. Tazewell County court records show that during court proceedings in December 1975 regarding the sewer project, WRCL Company was represented by the Peoria law firm of Parsons and McGuire. Nonetheless, the plaintiff did prepare the Waldheim annexation papers at the board's request, and he was paid by WRCL Company for that work.

Whether or not WRCL Company received preferential treatment in the delivery of sewer services to the Waldheim subdivision remains a matter of controversy between the parties. Preferential or not, the evidence indicates that WRCL Company did not receive a sewer "without any cost." Documentary evidence admitted at trial shows that WRCL Company paid assessments for the sewer project in 1984, and assessing the individual lots imposed a cost on WRCL Company by reducing the fair market value of its property.

In one of the articles, headlined "Wanless Earned More Than Peoria Attorney Last Year," defendants

stated:

"Each month Wanless attends two board meetings, which take about six hours combined. The remaining 100 hours [of an average 106 hours per month] for which he is paid are not itemized for the board. He submits the bill listing the hours he's worked, and he is paid that amount.
\*\*\*

Although he said he keeps a precise listing of time spent on village business, he doesn't provide those detailed records to the board.
\*\*\*

For example, his 'rough account' for April 1976 to September 1976 read: 'Legal services rendered in April 1976 to September 1976 in excess of the 60 hours per month covered by retainer fee: 215 at $30 per hour— $6,450.' "

The plaintiff did submit summary bills to the board and village clerk, but Lee Hinnen, chairman of the board's finance and judicial committee, testified that the plaintiff also submitted itemized bills listing for each month the matters for which services were provided and the total hours expended. Itemized bills for the months of May 1975 through January 1976 were admitted as evidence at trial, although itemized bills for the period April through September 1976, the months referred to in defendants' article, were not presented at trial.

In the third article, headlined "Wife's Land Value Benefits From Wanless-Prepared Rezoning Law," defendants reported that "[a] rezoning ordinance prepared by Village Atty. Frank M. Wanless in 1972 multiplied the value of 35 acres of land belonging to his wife." The article said that Mrs. Wanless had contracted to purchase the farmland only two months before it was rezoned from single-family to multifamily residential, although the vendor of the property was aware at the time of sale that his property and 13 other parcels of land were to be rezoned. According to the plaintiff, the

rezoning was done at the direction of the board of trustees to correct errors made in a 1969 zoning ordinance. The plaintiff also contended at trial that his wife's land did not increase in value; he argued that the tax assessments on the land had decreased and that if any increase in value had been caused by the rezoning it was accounted for in the purchase price. Defendants countered by producing an expert witness who examined the property and testified that in his opinion the land value had increased following rezoning. On cross-examination, however, the expert conceded that providing sewer lines and other incidentals would be so costly as to make development of the land unprofitable.

Jury deliberations produced nothing more precise than a general verdict for the plaintiff, but it is implicit in the verdict that one or more of the four separate alleged libels was found to be false and defamatory. Although there were factual errors in at least some of the articles, the plaintiff, as a public official, may not be awarded redress by the courts unless he has established by clear and convincing evidence that the defendants made their allegations "with 'actual malice'—that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726.

It is undisputed that the first amendment calls upon reviewing courts to conduct an independent review of the entire record to make certain that application of libel law to the case under review has not overstepped the permissible boundaries of State action under the first and fourteenth amendments (U.S. Const., amends. I, XIV). In cases of public-official libel, *New York Times* requires that we " 'examine for ourselves the statements in issue and the circumstances under which they were made to see ... whether they are of a character which

the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment protect.' " (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 285, 11 L. Ed. 2d 686, 709, 84 S. Ct. 710, 728-29, quoting *Pennekamp v. Florida* (1946), 328 U.S. 331, 335, 90 L. Ed. 1295, 1297-98, 66 S. Ct. 1029, 1031.) The *New York Times* requirement of independent review was reiterated in *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949, the court observing that the requirement "reflects a deeply held conviction that judges—and particularly Members of [the Supreme] Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution." (466 U.S. 485, 510-11, 80 L. Ed. 2d 502, 523, 104 S. Ct. 1949, 1965.) While the *Bose* court stressed that the duty is primarily upon the United States Supreme Court, the court also declared that the rule of independent appellate review "is a rule of federal constitutional law" (466 U.S. 485, 510, 80 L. Ed. 2d 502, 523, 104 S. Ct. 1949, 1965), and the supremacy clause of the United States Constitution (U.S. Const., art. VI) mandates that this court protect with equal vigor the values espoused in both the first amendment to the Federal Constitution (*The Gazette, Inc. v. Harris* (1985), 229 Va. 1, ___, 325 S.E.2d 713, 727) and section 4 of article I of the 1970 Illinois Constitution (Ill. Const. 1970, art. I, sec. 4).

Although in agreement that this court should make an "independent review" of the record to determine whether it clearly and convincingly establishes actual malice, the parties do not agree on what is contemplated by such a review. The plaintiff suggests that the court apply the same standard as that employed by a trial court when deciding a motion for judgment *n.o.v.* (Ill. Rev. Stat. 1985, ch. 110, par. 2—1202); that is, that this court affirm the jury's finding of actual malice unless

"all of the evidence, when viewed in its aspect most favorable to the [plaintiff], so overwhelmingly favors [defendant] that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) Applying the judgment *n.o.v.* standard, the plaintiff argues that this court should reinstate the jury's verdict as one not "against the manifest weight of the evidence." The defendant, however, accurately asserts that *Bose* calls upon the court to conduct a *de novo* review of the record and find upon its own examination of the facts whether clear and convincing evidence of actual malice was presented.

*Bose* states that " 'First Amendment questions of "constitutional fact" compel [the Supreme] Court's de novo review.' " (*Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 509 n.27, 80 L. Ed. 2d 502, 522 n.27, 104 S. Ct. 1949, 1964 n.27, quoting *Rosenbloom v. Metromedia, Inc.* (1971), 403 U.S. 29, 54, 29 L. Ed. 2d 296, 318, 91 S. Ct. 1811, 1825; see *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 515, 80 L. Ed. 2d 502, 526, 104 S. Ct. 1949, 1968 (Rehnquist, J., dissenting) ("in the interest of protecting the First Amendment, the Court rejects the 'clearly erroneous' standard of review mandated by Federal Rule of Civil Procedure 52(a) in favor of a '*de novo*' standard of review for the 'constitutional facts' surrounding the 'actual malice' determination")).) This court also has the duty to insure that governing principles of Federal constitutional law have been faithfully applied by the jury to the "discrete facts" (*e.g.*, what was done or said by the parties and the accuracy of defendant's news accounts) in reaching its conclusion of "constitutional fact" that the articles were published with *New York Times* actual malice. The court should not reexamine and refind those discrete facts (see *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 285 n.26, 11 L. Ed. 2d

686, 709-10 n.26, 84 S. Ct. 710, 729 n.26), nor should it disregard the fact finder's impressions of each witness' credibility (*The Gazette, Inc. v. Harris* (1985), 229 Va. 1, ___, 325 S.E.2d 713, 727-28; see *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 499-500, 80 L. Ed. 2d 502, 516, 104 S. Ct. 1949, 1959). But our review of the record in this case is conducted with the awareness that "[j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' " 466 U.S. 485, 511, 80 L. Ed. 2d 502, 523, 104 S. Ct. 1949, 1965.

There is no evidence that the defendants in this case purposefully published known falsehoods. Therefore, the question presented for this *de novo* review is whether the publication was made with reckless disregard for the accuracy of its contents. Recklessness in this sense must be carefully distinguished from negligence; "defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth." (*Garrison v. Louisiana* (1964), 379 U.S. 64, 79, 13 L. Ed. 2d 125, 135, 85 S. Ct. 209, 218.) To find *New York Times* actual malice in this case the plaintiff must establish that defendants "in fact entertained serious doubts as to the truth of [their] publication." (*St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1325.) The inquiry is necessarily subjective (*Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 511 n.30, 80 L. Ed. 2d 502, 524 n.30, 104 S. Ct. 1949, 1965 n.30), but testimony by Rothballer and editors of the Journal Star that they believed the allegations true is not dispositive.

"The finder of fact must determine whether the publication was indeed made in good faith. Professions of good

faith will be unlikely to prove persuasive, for example, where a story is \*\*\* based wholly on an unverified anonymous telephone call. \*\*\* Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 20 L. Ed. 2d 262, 267-68, 88 S. Ct. 1323, 1326.

The plaintiff suggests as general evidence of actual malice that Rothballer was an inexperienced investigative reporter, influenced by a partisan investigator from the Better Government Association who assisted in developing the stories; that Rothballer relied almost exclusively on plaintiff's political opponents in village government and that she did not confirm her information with neutral sources; and that the plaintiff was not informed of the allegations in advance of their publication and given an opportunity to comment. The plaintiff further argues that editors of the Journal Star knew that the plaintiff's reputation would be injured by the stories based on information culled from plaintiff's political opponents, yet they did not check Rothballer's sources. The Journal Star's reckless disregard is apparent, according to the plaintiff, because the decision to publish Rothballer's articles was made following a two-minute discussion by the editors of the Journal Star during which the accuracy of Rothballer's stories was not considered. The managing editor for the Journal Star at the time of the publication conceded that the truncated conference on whether to publish did not comport with "the usual standard of journalism."

Plaintiff's contentions and appraisal of the evidence do not convincingly establish actual malice. There is no requirement that reporters serve an apprenticeship to earn their first amendment protections; neither are those protections lost merely because the writer relied upon partisan sources where there was no reason to

question their veracity. (See *Tunnell v. Edwardsville Intelligencer, Inc.* (1969), 43 Ill. 2d 239, 247 (political animosity is distinguishable from actual malice).) The plaintiff complains that the stories did not constitute "hot news," so defendants should have allowed him to comment upon the allegations prior to their publication. The failure to investigate, however, does not constitute actual malice if the defendants did not seriously doubt the truth of their assertions, and the failure to solicit plaintiff's reaction was nothing more than a failure to follow a course of investigation and verification. See *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 160 (plaintiff's denial would not necessarily lead defendants to doubt the truth of their charges); *Colombo v. Times-Argus Association, Inc.* (1977), 135 Vt. 454, 457, 380 A.2d 80, 84.

The alleged acts of recklessness by editors of the Journal Star also fall short of proving actual malice. As already noted, reckless disregard cannot be inferred merely because defendants did not double check the facts supplied by known sources, unless there is reason to doubt their trustworthiness. (*Kidder v. Anderson* (La. 1978), 354 So. 2d 1306, 1309 (reliance upon sources antagonistic toward the subject of an alleged libel does not constitute actual malice where sources were in a position to know and where their assertions are not so improbable as to engender serious doubt).) Moreover, journalists are not held by the constitution to higher expectations of accuracy than any other members of the community. While newspapers generally have far greater resources than the average person to investigate the facts, those greater abilities only raise the spectre of reckless disregard when their use has revealed either insufficient information to support the allegations in good faith or information which creates substantial doubt as to the truth of published allegations. Because of "the stake of the people in public business and the conduct of public offi-

cials," mistakes made in the middle ground—where there is a good-faith reason to believe defamatory allegations and no reasons for serious doubt—do not expose the publisher to legal liability. *St. Amant v. Thompson* (1968), 390 U.S. 727, 731-32, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1326.

The plaintiff has not convincingly proved that defendants' assertion of double billing should be stripped of its first amendment protection. Mr. Wanless' conduct as a public official was of the utmost interest to local residents, and the ability of the Journal Star to debate his official integrity cut to the very core of first amendment values. By representing both petitioning parties and the municipality from which those parties sought favorable consideration, the plaintiff created a situation in which individuals and news organizations might, in good faith, conclude that the plaintiff conducted his affairs under a conflict of interest. The plaintiff claims that any compensation he might have received from the village for examining annexation papers and attending board meetings was clearly distinct from fees earned for preparing the documents, but the line which the plaintiff draws between his actual drafting of annexation petitions as private counsel and his public function of advising the village government and insuring that annexation requirements were complied with is too tenuous a demarcation upon which to premise a finding of actual malice. In light of the plaintiff's dual representation (although consented to by his clients) and an ongoing controversy between village officials regarding the conduct of the majority faction on the Morton board of trustees, we cannot say that Rothballer's errors of interpretation are indicative of a reckless disregard for the truth of her allegations. See *Tagawa v. Maui Publishing Co.* (1968), 50 Hawaii 648, 448 P.2d 337 (defendants not guilty of actual malice where they observed county em-

ployees working on plaintiff's property and published same as evidence of corruption when investigation would have established that plaintiff was reimbursing county in a lawful arrangement).

In the context of the Waldheim sewer connection, the plaintiff's simultaneous preparation of annexation documents on behalf of WRCL Company and ordinances for the sewer project on behalf of the village lent credence to Rothballer's mistaken belief that the plaintiff had represented WRCL Company in connection with public hearings or court proceedings relating to the sewer-improvement project. That Rothballer knew the plaintiff's preparation of those annexation documents to have been undertaken at the board's request does not indicate that she entertained doubts as to the truth of her assertions. Although the plaintiff was directed by the board to draft the Waldheim annexation petition, the fact that he also received compensation from WRCL Company fostered Rothballer's charges of conflict as well as the inference that his conflict was related to allegedly preferential treatment accorded the Waldheim subdivision. Given the dual position occupied by the plaintiff and the public attention which naturally focuses on the allegedly preferential allocation of governmental resources, "[t]he statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies." *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 513, 80 L. Ed. 2d 502, 525, 104 S. Ct. 1949, 1966.

It cannot be said that defendants were reckless in making the statement that the plaintiff offered only a rough accounting of his hours to the board of trustees. Rothballer requested copies of plaintiff's bills from the village clerk, and she was given copies of his summaries only. While a more thorough investigator might have inquired of the plaintiff whether he also submitted item-

ized bills, the failure to ask this question does not of itself establish actual malice.

Neither was the report that rezoning multiplied the value of Mrs. Wanless' 35-acre parcel of land shown to have been disseminated with actual malice. In making that assertion, Rothballer relied upon the opinions of trustee Ruth Ferguson (known to Rothballer as a member of the board's minority faction and as a political opponent of the plaintiff's), Ralph Giacinti (a landowner whose property had been denied rezoning) and Morton's superintendent of public works, as well as her own supposition that rezoning property owned by the wife of the village attorney to allow more uses for the land would increase its value. Failure to have the land appraised or to examine changes in the assessed value of the land does not evince actual malice by defendants. Tax assessments are poor indicators of land value (*City of Chicago v. Harrison-Halsted Building Corp.* (1957), 11 Ill. 2d 431, 439), and it was reasonable to conclude that rezoning from single-family to multifamily residential would be beneficial to the landowner and add to the value of the land. Therefore, it cannot be said that defendants made this assertion of opinion with reckless disregard for its probable falsity merely because they did not buttress Rothballer's opinion with an expert appraisal.

Considering all the evidence, this court is of the opinion that the plaintiff has failed to prove the existence of actual malice convincingly. Although Rhonda Rothballer and the Peoria Journal Star carried out their investigation of Frank Wanless and his conduct as village attorney carelessly and without thoughtful consideration of the damaging effects their claims might have upon the plaintiff's reputation if those claims were made in error, carelessness alone cannot support the imposition of damages in this case.

*Judgment affirmed.*

JUSTICE RYAN took no part in the consideration or decision of this case.

JUSTICE GOLDENHERSH, dissenting:

I dissent. I do not agree with the majority that the evidence was insufficient to sustain the finding, implicit in the jury's verdict, that the statements published by defendants were made with actual malice. In *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, the Supreme Court said that a public official may not recover damages "for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726.) In my opinion, the evidence here was sufficient to show that these statements were made with reckless disregard of whether or not they were false. The evidence shows that the defendant reporter who prepared the articles obtained much of her information from other officials of the village whom she knew were opposed to plaintiff in a heated political campaign. She had available to her and reviewed the records of the village, including information obtained by the village board prior to concluding that no action by plaintiff resulted in a conflict of interest. Failure to check the information obtained from sources obviously hostile to plaintiff indicates a reckless disregard for whether the statements were false and refutes the conclusion of the majority that there was no reason to suspect the truth of the information which she had obtained.

The managing editor of the defendant newspaper conceded that the procedure followed in deciding to publish the articles did not meet the usual standards of publication. The evidence shows clearly that the editors knew

that the "sources" of the unfavorable statements were individuals who were politically opposed to plaintiff. Their failure to check the truthfulness of the charges was sufficient evidence to support the verdict awarding both compensatory and punitive damages. I am cognizant of the Supreme Court's admonition that a court reviewing a libel judgment must make an independent review of the record. I am equally aware that the question whether defendants acted with reckless disregard of whether the statements contained in the articles were false was for the jury. Our independent review of the record does not authorize us to disregard a conclusion reached by the finder of fact and which is supported by the evidence. I therefore dissent and would reverse the appellate court and reinstate the judgment.