(No. 65083.—

JERRY COSTELLO, Appellee, v. CAPITAL CITIES COMMUNICATIONS, INC., *et al.*, Appellants.

*Opinion filed December 15, 1988.*

CUNNINGHAM and STAMOS, JJ., took no part.

Paul Brown, of Brown, Hay & Stephens, of Spring-
field, and Robert B. Hoemeke, John M. Hessel and Jo-
seph E. Martineau, of Lewis & Rice, of St. Louis, Mis-

souri (Donald Martin, of New York, New York, of counsel), for appellant Capital Cities Communications, Inc.

Richard O. Erdmann, of Fairview Heights, for appellant Richard Hargraves.

Amiel Cueto, of Cueto, Daley, Williams, Moore & Cueto, Ltd., of Belleville, for appellee.

Jon A. Duncan, of Mass, Miller & Josephson, Ltd., of Chicago, for *amicus curiae* Chicago Headline Club.

JUSTICE WARD delivered the opinion of the court:

Jerry Costello, elected chairman of the St. Clair County board, filed an action for libel in the circuit court of St. Clair County against Capital Cities Media, Inc. (Capital Cities), the owner of the Belleville News Democrat (News Democrat), a newspaper of general circulation in St. Clair County, and Richard Hargraves, the editor of the News Democrat's editorial page. The complaint alleged that the defendants had libeled the plaintiff in an editorial published on December 30, 1980, in the News Democrat. The circuit court dismissed the plaintiff's complaint for failure to state a cause of action.

The appellate court reversed, judging that the complaint stated a cause of action for libel *per se* and remanded the cause to the circuit court for further proceedings. (*Costello v. Capital Cities Media, Inc.* (1982), 111 Ill. App. 3d 1009 (*Costello I*).) The defendants' petition for leave to appeal to this court was denied and the case proceeded to trial.

The circuit court after a bench trial entered judgment for the plaintiff and awarded Costello $450,000 in actual damages against both defendants, and $600,000 in punitive damages against Capital Cities. The appellate court, with one judge dissenting, affirmed the judgment for the

plaintiff but reversed the award of punitive damages. The court also reduced the award of actual damages to $200,000. (153 Ill. App. 3d 956 (*Costello II*).) This court granted the defendants' petition for leave to appeal (107 Ill. 2d R. 315).

The facts underlying this appeal were set out by the appellate court in *Costello II*. Because the resolution of the issues raised in this appeal depends importantly upon the facts, however, we will state again the background of this litigation. In 1980 a dispute arose regarding the method of funding mass transit in the St. Louis metropolitan area. The Bi-State Development Agency furnished public transportation to this metropolitan area, which included St. Clair, Madison and Monroe Counties, located in Illinois. Our legislature responded to the funding debate by amending the Local Mass Transit Act (Ill. Rev. Stat. 1979, ch. 111$\frac{2}{3}$, par. 351 *et seq.*) to give the county boards of St. Clair, Madison, and Monroe Counties authority to create transit districts. This amendment also gave the chairman of these respective county boards authority to appoint trustees to govern these transit districts. If the county boards exercised their authority to create a transit district, the amendment empowered the trustees of these districts to impose a sales tax up to one-fourth of one cent, the proceeds of which would be used to fund public transportation. The News Democrat strongly opposed the creation of transit districts and the imposition of any sales tax to subsidize public transportation without a public referendum through which the voters could express approval or disapproval of a tax.

At the time of the debate over the method of funding mass transit, the plaintiff was a candidate for the office of chairman of the St. Clair County board. In September 1980, the editorial board of the News Democrat informed the plaintiff that it was considering endorsing his candidacy and invited him to meet with it to discuss his

views. The plaintiff met with defendant Hargraves, reporter Steven Pounds and, at times, Darwin Wiles, the publisher of the News Democrat, in the paper's offices, where they discussed the plaintiff's views on taxation and other local governmental matters. The parties at trial gave differing accounts of the plaintiff's statements regarding the creation of a transit district and the implementation of a tax to subsidize mass transit.

Costello testified that he told the editorial board only that he would not be in favor of any new tax during his first term without a referendum. Hargraves testified that, at the meeting, Costello expressed opposition to the imposition of a transit tax without a referendum and "left the impression" that he would vigorously use the political influence he would have as county board chairman to oppose such a tax without a referendum.

Defendant Wiles testified that Costello positioned himself at the meeting as a fiscal conservative, who would do everything possible to oppose any tax increases without a referendum. Wiles testified that, to his mind, Costello was stating a position and making a pledge or commitment to do everything he could to oppose a tax increase. He testified that Costello made it clear during the interview that he was going to be a strong county board leader who had not only the will to oppose taxes, but the ability to deliver on his promises.

The News Democrat subsequently endorsed Jerry Costello for chairman of the county board in an editorial published on October 19, 1980. This editorial stated that Costello had "pledged," in his endorsement interview with the News Democrat, that he did not favor the imposition of any new tax without a referendum and that he saw no need for any tax increase during his term. The editorial concluded with reasons why the News Democrat believed Costello had the ability to accomplish his

goals. In the subsequent November election, Costello was elected chairman of the St. Clair County board.

After the election, the dispute over the creation of a transit district and the implementation of a sales tax intensified. A committee appointed by Costello's predecessor in office recommended that the St. Clair County board adopt a proposed resolution to create a transit district. This resolution was placed on the agenda for consideration by the post-election county board at its first meeting, scheduled for December 29, 1980.

On December 29, Costello met with David Hickey, another county board member who opposed the transit district resolution, to devise a strategy to defeat the resolution. At this meeting, they collaborated in preparing a motion to table the resolution until the matter could be submitted to the voters in an advisory referendum in April 1981. Costello agreed to recognize Hickey, who would present the motion to table, and to contact another board member to second the motion. That evening, the county board met for its first regular meeting following the November election. Members of the public and media were present, including Steven Pounds, the county government reporter for the News Democrat. Costello presided at the meeting. As presiding officer, Costello's role was restricted to that of a parliamentarian. Costello testified that he was prohibited from voting on measures before the board and from speaking in favor of or in opposition to the substance of matters coming before the board by the Revised Code of St. Clair County, which governed the conduct of the board's business.

During this meeting, a proponent of the resolution to create a transit district called for its adoption. As prearranged, Costello recognized Hickey, who moved to table the resolution pending an advisory referendum. Costello's brother, Joseph Costello, a county board mem-

ber, seconded the motion. A roll call vote was taken and the motion to table was defeated 22 to 6. The board subsequently adopted the resolution creating a transit district by a vote of 22 to 6. Costello made no statements in opposition to the resolution and did not vote against it, as he was prohibited from doing so. Immediately after the board adopted the resolution, Costello nominated three trustees for the district and the board confirmed the nominations.

On December 30, defendants learned that the board had voted to create a transit district. Hargraves testified that publisher Wiles and he decided that the News Democrat should publish two editorials: one critical of the county board for adopting a resolution to create the transit district without a voter referendum, and the second critical of Jerry Costello "for not providing the effective leadership he had promised to provide."

Hargraves testified that he spoke with four persons before writing the editorials: Steven Pounds, the News Democrat reporter who attended the county board meeting, David Hickey, the sponsor of the motion to table the resolution, Edward Anderson, a county board member belonging to the opposition party of the plaintiff, and Darwin Wiles. Hargraves testified that Steven Pounds simply referred him to the article he had written for the News Democrat, which reported that the county board had voted to create a taxing district which could impose a tax. The article also reported that Hickey had moved to defer the creation of the taxing body until after the April referendum but that this motion was defeated. Hargraves testified that Pounds told him that he knew of nothing that happened beyond what he reported in his story.

Hargraves also spoke with Hickey by telephone, who told him: "Sir, I tabled the motion—I mean I made a motion to table the issue ***. You should talk to your own

reporter that was there ***. You should have known my views on the matter for the last at least six months. Why don't you read your own newspaper?"

Hargraves also spoke with county board member Edward Anderson, a friend of Hargraves. Anderson testified that Hargraves asked him whether Costello had asked him to vote for or against the transit district, to which Anderson replied that he did not discuss the matter with Costello and that Costello had not asked him to vote either way on the issue.

After these conversations, Hargraves drafted two editorials. The first, captioned "St. Clair County Board Refuses to Give You a Chance to Decide," criticized the county board for adopting the resolution creating the transit district without conducting a referendum. He also prepared a second editorial criticizing Costello. Hargraves testified that he presented a draft of the latter editorial to publisher Wiles, who said that the editorial was not strong enough, that Costello had lied to the News Democrat and that the editorial should therefore be much more vigorously critical of Costello, so that he would not think he "could get away with this type of thing and get the newspaper's support again."

Apparently the Costello editorial was revised and on December 31, 1980, the two editorials were published on the "Opinion" page of the News Democrat within a box labeled "Our Viewpoint." The editorial critical of Costello is the subject of this libel action:

"Costello blew his first chance

Jerry Costello lied to us. There's no nicer way to put it; he simply lied. And when he lied to us, he lied to you. He said he was going to be a tough county board chairman, especially when board members wanted to spend taxpayers' money. He said he would militantly oppose the implementation of any new tax without first seeking the voters' approval through a referendum. He said he would lead the

County Board down the proper paths, protecting the rights of the taxpayers. Well, he lied. He didn't do any of those things Monday night, thereby breaking his most sacred campaign promise at his very first meeting. The County Board had an opportunity to conduct a binding referendum, asking you if you wanted to pay a new sales tax to support the Bi-State bus system. That's the very thing Costello had pledged he would do. He had promised, in the strongest possible terms, that he would let the voters decide. But when the time came to make a decision, he was up there sitting on his gavel.

Some leader! You couldn't tell him from any other politician in the bunch. He did absolutely nothing to protect your interests. To say we're disappointed is too mild; we're irate. We supported Costello's election because of what he said to us. We told you what he said and how we thought he was different from the run-of-the-mill, Touchette-dominated Democrats of the past. Now we wonder if we didn't lie to you. Maybe Costello isn't different. Maybe Costello didn't mean any of the things he said. Maybe his opponent, Republican Larry Reinneck, was right when he said Jerry Costello was nothing more than another patronage-oriented political hack. How are we supposed to tell otherwise? Jerry Costello asked for a chance to prove himself and, in his very first meeting, he blew it. Just think, we've got two more years of the Costello brand of lying leadership. Doesn't that thrill you?

—RICHARD N. HARGRAVES"

On January 4, 1981, Costello sent a letter "to the Editor" of the News Democrat, which detailed Costello's acts of opposition to the resolution creating the transit district and his efforts to table the resolution until after the April advisory referendum. The letter stated, "Mr. Hargraves accused me of lying to him and the News-Democrat because I had told them of my opposition to the Transit District, and then I was unable to prevent the resolution from passing. If he had accused me of not being effective in convincing the Board members to vote against the resolution that would have been a valid criti-

cism. But Mr. Hargraves knows that each Board member has a vote, he knows that I cannot compel them to vote in a certain way. He knew what my position was and is, and he knows I did not lie." Wiles testified that the News Democrat chose not to publish Costello's letter because in it, Costello had threatened to bring a lawsuit against the paper.

On January 6, 1981, Costello filed this libel action against Hargraves and Capital Cities. In his complaint, he alleged that these following statements in the editorial were defamatory: (1) "Jerry Costello lied to us"; (2) "There's no nicer way to put it, he [Costello] simply lied"; (3) "And when he [Costello] lied to us, he lied to you"; (4) "Well, he [Costello] lied"; (5) "But when the time came to make a decision, he [Costello] was up there sitting on his gavel"; (6) "He [Costello] did absolutely nothing to protect your interests"; (7) "Just think, we've got two more years of the Costello brand of lying leadership."

As stated, the circuit court dismissed the complaint and the appellate court reversed that judgment. Upon remand, the cause was tried and resulted in a judgment for the plaintiff. The appellate court affirmed the judgment, but reversed the award of punitive damages and reduced the award of compensatory damages to $200,000. (*Costello II*, 153 Ill. App. 3d 956.) One justice dissented, saying judgment should have been for the defendants. The plaintiff in this appeal does not contend there was error in reversing the one award or in reducing the other.

On this appeal, the defendants contend: (1) that the critical statements in the editorial are not libelous *per se*; (2) that the allegations in the editorial are substantially true; (3) that the allegedly defamatory statements are expressions of opinion constitutionally protected; (4) that the plaintiff failed to prove by clear and convincing evidence that the defendants acted with actual malice; and

(5) that the compensatory damages allowed to stand by the appellate court are excessive.

We first address the defendants' claim that the statements are not libelous *per se.* The plaintiff did not aver that he suffered actual pecuniary loss as a result of the alleged libel. He argues, however, that the accusations in the editorial are libelous *per se* and give rise to a cause of action for defamation without proof of special damages. For a plaintiff to recover in an action based on libel *per se,* the statements that form the basis of the action must falsely charge the plaintiff with misconduct or incapacity in words so obviously and naturally harmful that they are actionable without proof of special damages. (*Fried v. Jacobson* (1983), 99 Ill. 2d 24.) Statements are held to be libelous *per se* if they impute: (1) commission of a criminal offense; (2) infection with a loathsome communicable disease; (3) inability to perform or want of integrity in the discharge of duties of office; and (4) lack of ability in a person's trade, business or profession. (*Catalano v. Pechous* (1978), 69 Ill. App. 3d 797, 805, *aff'd* (1980), 83 Ill. 2d 146.) Whether the editorial examined here constituted libel *per se* was a question of law to be decided by the courts below. (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344.) The appellate court held in *Costello I* that the statements in the editorial, specifically the repeated reference to Costello's lies and his lying brand of leadership, were libelous *per se* because they imputed an inability to perform and a want of integrity in discharging the duties of his office. *Costello I,* 111 Ill. App. 3d 1009.

The accusations in the editorial are not to be regarded as actionable *per se,* however, if the words are reasonably susceptible to an innocent construction. The defendants argue that the appellate court's decision conflicts with other appellate court decisions which held that similar charges of dishonesty were not libelous *per se,* because they were susceptible to an innocent construction. (See

*Wade v. Sterling Gazette Co.* (1965), 56 Ill. App. 2d 101 (editorial entitled "NO WORD TAKES THE PLACE OF A LIAR," which stated that plaintiff told a "lie of the common garden variety" and that plaintiff was an "unadulterated liar," held not libelous *per se*); *Delis v. Sepsis* (1972), 9 Ill. App. 3d 217 (letter accusing plaintiff of "being a deliberate liar and distorter of truths" and "deluded, deceptive and possessing a distorted state of mind" held to be mere name calling and not libel *per se*); *Britton v. Winfield Public Library* (1981), 101 Ill. App. 3d 546 (letter "to the Editor" accusing plaintiff of "dirty tricks," "cheap and dishonest government and demanding a reprimand and public apology to restore honest and upright government" to the village held not libelous *per se*).) These appellate court decisions held that accusations of dishonesty which may be construed as harsh criticism of the plaintiff's conduct in a single instance, rather than a general assault on the plaintiff's character and integrity, are capable of being read innocently, and are not libelous *per se*. These courts reasoned that statements which generally assault a person's character or integrity pose a serious threat to the victim's reputation, while criticism of a person's character or integrity in a particular instance do not. Therefore, only the former statements were regarded as libelous *per se*. Applying this to the case here, the defendants argue that the appellate court erred in concluding that the statements in the editorial which accused Costello of lying amounted to a general assault on Costello's character, rather than criticism of his conduct on a particular occasion.

We need not determine whether the accusations in question amounted to a general assault on Costello's character or simply criticized his integrity in a particular instance, because we conclude that that ground in *Wade*, *Delis* and *Britton* is no longer valid. The ground was simply an outgrowth of the innocent construction rule, as it

originally existed, which provided that all allegedly defamatory statements which were capable of being read innocently, must be so read and declared nonactionable as a matter of law. (*John v. Tribune Co.* (1962), 24 Ill. 2d 437, 442.) The *Wade, Delis* and *Britton* decisions considered the innocent construction rule to require that all statements which could be construed as criticism of an individual's conduct or integrity in a particular instance must be given an innocent construction. This allowed courts to dismiss libel actions without actually considering whether the statement in question had a defamatory meaning. In *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 350, however, this court observed that courts applying the innocent construction rule were straining to find innocent meanings for words, when a defamatory meaning was far more reasonable. This court in *Chapski* held that a modification of the rule was necessary to protect an individual's interest in vindicating his good name and reputation, while allowing the first amendment guarantees a necessary "breathing space." As modified, the innocent construction rule requires courts to consider a written or oral statement in context, giving the words and implications therefrom their natural and obvious meaning. If, then, the statement "may reasonably be innocently interpreted," it will not be regarded as actionable *per se*. (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352.) Under *Chapski*, the distinction between statements which accuse a person of having a dishonest character in general and statements which accuse an individual of lying in a particular instance is no longer relevant, for only statements which "may reasonably be innocently interpreted" may be declared nonactionable as a matter of law. We reject the defendants' contention that the pertinent statements in the editorial are not libelous *per se* because they accuse the plaintiff of dishonesty on one particular occasion. The defendants do not suggest that

the disputed accusations may be given a meaning which is not defamatory. Nor does the *Chapski* decision allow us to consider the language, which a number of times accuses Costello of lying, as being innocent of libelous content as a matter of law. The defamatory meaning is evident. (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344.) The statements in the editorial are not reasonably susceptible to an innocent construction, and are to be considered libelous *per se* because they imputed to Costello a want of integrity in discharging the duties of his office.

The defendants next argue that they are not liable for defamation because the allegations in the editorial are substantially true. The evidence before the trial court established beyond doubt, however, that the disputed editorial did not accurately portray what occurred at the December 29, 1980, meeting of the St. Clair County board. For example, the editorial stated that the county board had the power to conduct a binding referendum on the transit tax issue. In fact, the county board only had the authority to call for an advisory referendum. Moreover, the editorial suggested that the county board had imposed a transit tax on the people of St. Clair County at the meeting. In truth, the board had only exercised its authority to create a transit district and appoint trustees. The board itself had no taxing powers and only the trustees of the newly created transit district could impose a tax to support mass transit. The editorial also stated that Costello promised to let the voters decide whether they wanted such a tax. In fact, Costello made no such promise, but had only stated that he opposed the imposition of a transit tax without a voter referendum. As stated above, the voters could not have been the final decisionmakers, because the county board had authority to call for an advisory, not a binding, voter referendum on the transit tax issue. The editorial also accused Costello of "sitting on his gavel" when the time came to make a de-

cision on the transit district resolution. The editorial did not mention that Costello was prohibited from expressing his opposition to the transit district resolution at the meeting and was prohibited from voting against the resolution by an ordinance which governed the meetings. Although the editorial accused Costello of lying and of doing "absolutely nothing" to protect the taxpayers' interests, the evidence at trial convincingly established the falsity of these accusations. Costello testified that he never made the broad-based promises which the defendants stated that he made. Costello also introduced uncontroverted evidence which established that he exerted considerable effort to defeat the transit district resolution. For example, Costello testified that he communicated with at least nine members of the county board to voice his opposition to the transit district resolution and to urge them to vote against the resolution. Seven members of the county board testified at trial that Costello met with them and urged them to oppose the transit district resolution. The evidence also established that Costello collaborated in drafting a motion to table the resolution and arranged for his brother to second this motion. In sum, the evidence convincingly proved that the critical statements in the disputed editorial were false.

The defendants next contend that even if the accusations against Costello in the editorial were false and defamatory, the plaintiff cannot prevail because the defamatory statements are expressions of opinion which are absolutely protected under the first amendment. We need not address this contention, however, because we conclude that the plaintiff failed to prove that the defendants published the defamatory statements with actual malice.

A public official may not obtain redress in a libel action unless he proves that the allegedly defamatory statements were made with actual malice. (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d

686, 84 S. Ct. 710.) This constitutional standard requires the plaintiff to prove by clear and convincing evidence that the defendant published the defamatory statements with knowledge that the statements were false or with reckless disregard for their truth or falsity. (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710.) This standard was further defined by the Supreme Court in *St. Amant v. Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323, where the Court held that reckless disregard for the truth may be found only where the evidence shows that the defendant in fact entertained serious doubts as to the truth of the publication. Recklessness, therefore, is defined in terms of the subjective state of mind of the defendant. The Supreme Court has also held that appellate courts must independently review the record in a public official's defamation suit to insure that the judgment is supported by clear and convincing evidence of actual malice. *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710; *Bose Corp. v. Consumers Union of United States* (1984), 466 U.S. 485, 511, 80 L. Ed. 2d 502, 523, 104 S. Ct. 1949, 1965; *Wanless v. Rothballer* (1986), 115 Ill. 2d 158.

From our independent review of the evidence in the record, we conclude that the plaintiff failed to satisfy his burden of proving actual malice by clear and convincing evidence. At trial, the defendants testified that they subjectively believed that Costello lied to them and attempted to explain the basis of this belief. The defendants testified that they were led to believe, as a result of their pre-endorsement interview with Costello, that Costello would vigorously use his "political clout" as county board chairman to defeat the resolution in favor of a transit tax without a referendum. The defendants said that they endorsed Costello's candidacy because they believed he had pledged that he would not impose any

new tax on the people of St. Clair County without a referendum. They expected Costello to exert all of the political pressure he could to provide the people of St. Clair County with a chance to be heard. When the county board adopted the transit district resolution by a wide margin, they decided to write an editorial criticizing what they deemed was Costello's lack of effort to defeat the resolution. They testified that they had no knowledge of any of Costello's efforts to influence members of the county board to vote against the resolution at the time they wrote the editorial. Wiles admitted that he instructed Hargraves to point out in the editorial that Costello failed to fulfill his promises and to state that Costello had lied. Wiles testified as to the basis for his belief that Costello lied, explaining:

> "I felt that we were greatly misled. I felt that there was a false impression created on the basis of that endorsement interview that he never followed through on. From the time we interviewed him, from the time he made those commitments *** We never saw him do the things that we felt and that we thought he was going to do. Up until the *** meeting, we never saw the activity, we never believed there was any activity of the kind that we were led to expect there to be and I felt that we had to say that."

The plaintiff argues that this court may not give any weight to the defendants' testimony because the trial court concluded that all of the defendants' self-serving testimony was false. The plaintiff mischaracterizes the trial court's findings. Although the trial court did reject the defendants' argument that the editorial was correct in reporting that the county board's action resulted in the imposition of a tax, the trial court did not find that all of the testimony of the defendants was false and not worthy of belief.

We recognize, however, that the defendants cannot automatically insure a favorable verdict by simply testifying

that they published the defamatory statements with a belief that the accusations were true. The fact finder must independently determine whether the publication was indeed made in good faith. (*St. Amant v. Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323.) While the trial court did not make an explicit finding of good faith, it did state that the defendants subjectively believed that Costello lied and this, of course, stands in contradiction to the trial court's conclusion that the defendants acted with actual malice.

The plaintiff did introduce evidence to support his claim that the defendants acted with actual malice. He did not, however, introduce clear and convincing evidence that the defendants subjectively entertained serious doubt about the truth of their assertion that Costello lied at the time they published the defamatory editorial. The evidence does convincingly demonstrate that the defendants were careless and professionally inadequate in investigating Costello's efforts to defeat the transit district resolution. The trial court expressed its "shock" at the "cavalier lack of care and effort of the defendants in their investigative procedures." Actual malice is not measured by what a reasonably prudent person would have published or should have investigated before publishing. (*St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1325.) Failure to investigate does not itself establish actual malice if the defendants did not seriously doubt the truth of their assertions. (*Wanless v. Rothballer* (1986), 115 Ill. 2d 158, 172.) This court will infer that a media defendant published defamatory statements in reckless disregard for their truth only when the defendant's investigation has revealed either insufficient information to support the defamatory accusations in good faith or creates a substantial doubt as to the truth of those accusations. *Wanless v. Rothballer* (1986), 115 Ill. 2d 158, 172.

As discussed above, Hargraves contacted four persons before writing the complained-of editorial. Three of these testified at the trial. The first, Hickey, testified at great length about Costello's efforts regarding the motion to table the transit district resolution until the April referendum. Hickey did not testify, however, that he informed Hargraves that Costello collaborated in drafting the motion or that Costello had arranged for his brother to second the motion. The defendants rebutted any inference that Hickey put them on notice of Costello's activities by introducing into evidence Hickey's deposition testimony. In his deposition, Hickey admitted that Hargraves asked him whether Costello had attempted to influence any board member's vote, to which Hickey replied, "not that I know of." Although Hickey's testimony at trial was that Costello exerted considerable effort to defeat the transit district resolution, his testimony failed to prove that the defendants were aware of Costello's efforts when the editorial was written. As of that time, Hargraves had been told by Hickey only that the plaintiff had not, to his knowledge, attempted to influence any of the board members.

Anderson, the county board member Hargraves named as his second source, testified that he told Hargraves that Costello had never discussed the transit district resolution with him or asked him to vote against the resolution. Thus, Anderson supported Hargraves' position that Costello had done nothing to persuade other board members to vote against the transit district resolution.

Hargraves' third source, Steven Pounds, did not testify at the trial. Hargraves testified that Pounds simply referred him to the article he had written and told him that he knew nothing beyond that which he reported in the news article. Pounds' article did not reveal that Costello had collaborated in drafting the motion to table

or that Costello's brother had seconded that motion. It simply reported that the board had defeated Hickey's motion to table the resolution and had adopted the resolution creating a transit district which could impose a tax. The plaintiff presented no evidence to suggest that Pounds informed the defendants of Costello's efforts to defeat the transit district resolution or had knowledge of all the plaintiff had done.

The plaintiff did present evidence which established that Costello was prohibited from speaking in opposition to the transit district resolution at the meeting by an ordinance which governed the county board's meetings. The plaintiff did not offer evidence that the defendants were aware of the ordinance which prohibited Costello from expressing his views at the time they wrote the editorial. Both defendants testified that they were unaware of this limitation imposed on Costello until after the editorial was published.

The plaintiff also introduced into evidence an article written by Pounds and editorials published in the News Democrat which recounted Costello's opposition to any measures which would result in a tax increase without a referendum. This evidence, however, suggests only that the defendants were aware of Costello's opposition to the transit district resolution. It does not establish that the defendants were aware of Costello's efforts to persuade other board members to oppose the creation of a transit district until the April referendum. Moreover, the trial court specifically found that neither defendant recalled previously published articles regarding Costello's public opposition to the transit tax at the time they published the disparaging editorial.

The plaintiff also complains of the defendants failure to contact him before publishing the editorial to determine whether he exerted any effort to defeat the resolution. Actual malice is not shown by a reporter's failure to

solicit a public official's reaction to criticism. (*Wanless v. Rothballer* (1986), 115 Ill. 2d 158, 172.) Moreover, Wiles testified that he attempted to reach Costello by telephone and left a message at Costello's office, but that Costello never returned his call.

As a final point of showing that the defendants acted with actual malice, the plaintiff argues that the evidence reveals that the defendants failed to disclose all of their sources and asserts that this court may therefore infer that these undisclosed sources would have proven their actual malice. The defendants concede that courts may draw a negative inference when a party deliberately fails to produce evidence which that party would reasonably be expected to produce in support of his position (Gard, Illinois Evidence Manual R. 3.23 (2d ed.)). They argue, however, that a negative inference may not be drawn in this case because the trial court never made the necessary preliminary finding that Hargraves concealed the identity of any source. We agree. The evidence at trial was that Hargraves contacted four sources before writing the editorial (Wiles, Pounds, Hickey and Anderson). Hickey testified, however, that Hargraves told him in May 1984, that he had six or seven sources for the editorial. Hargraves testified that he told Hickey only that he had "several" sources. The trial court never resolved this conflict in testimony, nor did it find how many sources Hargraves actually contacted. The court simply observed that "Hargraves and Hickey could not even agree on the number of 'reliable' sources that Hargraves allegedly contacted to lend credence to the article." In the absence of a specific finding by the trial court as to the number of sources Hargraves contacted, this court will not speculate that additional sources existed whose identities were never revealed. Nor will we speculate that these anonymous sources would have established that the defendants published the editorial with actual malice.

We would add that we have discussed this contention of the plaintiff, though a stipulation he entered into in the trial court may have barred him from raising the claim of concealment by the defendants of the identity of news sources. The question originally appeared when, while being deposed by the plaintiff, Hargraves identified his publisher, Darwin Wiles, and another reporter, Steven Pounds, as news sources, but refused to name two other persons he contacted prior to writing the complained-of editorial, claiming privilege under the first amendment.

The trial court found Hargraves in wilful and direct contempt and ordered him taken into custody. The court's order stated that Hargraves could purge himself of contempt by agreeing to complete the pretrial discovery process and revealing the names of the two other sources. Hargraves then sought a writ of prohibition in this court, and the contempt order was temporarily stayed. This court lifted its stay shortly thereafter and denied the writ. Hargraves' application for *certiorari* in the Supreme Court was denied, and Hargraves was ordered taken into custody and held in the St. Clair County jail until he purged himself of contempt. The following day, county board member Edward Anderson volunteered that he was one of the two confidential sources and Hickey revealed that he also had talked to Hargraves. Hargraves was ordered released from custody upon a stipulation by the parties that the defendant had complied with the trial court's order of disclosure.

In sum, the evidence introduced at trial demonstrated that Costello opposed the resolution to create a taxing district without a voter referendum; that the defendants knew that Costello opposed the transit district resolution at the time of the pre-endorsement interview; and that Costello exerted efforts to persuade other board members to vote against the transit district resolution and to table the resolution until after the April referendum. The

evidence failed, however, to demonstrate that the defendants knew, prior to the editorial's publication, of Costello's efforts to defeat the transit district resolution. Nor did the evidence show, as *St. Amant v. Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1312, requires, that the defendants entertained serious doubts as to the truth of their assertions that Costello did nothing to defeat the resolution and that he lied. As stated earlier, actual malice may not be found if the defendants subjectively believed that their accusations were true. (*St. Amant v. Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1312.) The trial court's statement that the defendants subjectively believed that the plaintiff had lied is not consistent with its conclusion that the defendants acted with actual malice.

Our independent review of the evidence of record requires the holding that the plaintiff did not satisfy his burden of proving actual malice by clear and convincing evidence. In the absence of proof of publication with actual malice, the judgments of the circuit and appellate courts must be reversed.

For the reasons given, the judgments of the circuit court and of the appellate court are reversed.

*Judgments reversed.*

CUNNINGHAM and STAMOS, JJ., took no part in the consideration or decision of this case.