Joseph PATLOVICH, M.D., Plaintiff,

v.

Thomas A. RUDD, M.D., Defendant.

No. 96 C 3426.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 20, 1996.

David J. Tecson, Daniel Joseph Fumagalli, Fumagalli, Tecson & Brent, Ltd., Chicago, IL, for Plaintiff.

Malcolm Hirsten Brooks, Marc L. Fogelberg, Peter J. Strand, McBride, Baker & Coles, Chicago, IL, Paul E. Veith, Eric Ste-

phen Mattson, Sidley & Austin, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Plaintiff Joseph Patlovich, M.D., brings this three-count complaint against Defendant Thomas A. Rudd, M.D., seeking damages in excess of $50,000 for libel, slander, and breach of contract. Patlovich resides in Florida, while Rudd resides in Illinois, which gives this court diversity jurisdiction over their dispute. 28 U.S.C. § 1332(a)(1). Presently before this court is the defendant's motion to dismiss all three counts of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is denied.

### I. Motion to Dismiss Standard

Dismissal under Rule 12(b)(6) is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). For purposes of this motion, we must take all of the well-pleaded factual allegations in the complaint as true, and construe them in the light most favorable to the plaintiff. *See Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir.1995).[1]

### II. Background

Pathology and Nuclear Medicine Associates, S.C. ("PNMA") is a corporation comprised of a small group of physicians who provide pathology services to hospitals and various other entities in Lake County, Illinois. Pl.'s Compl. at 1–2. One service that PNMA provides to its hospital clients is the testing of tissue samples from patients: this service was frequently provided in conjunction with the Consolidated Medical Laboratories ("CML"), a joint venture between Highland Park Hospital and Lake Forest Hospital which was supervised by PNMA staff. *Id.* Patlovich is a pathologist who served as President of PNMA, and Executive Director of CML, from 1977 until 1995. Rudd also worked for PNMA, serving as a director, officer, and shareholder of the company from the late 1970s until 1993, when he was forced to resign. *Id.* Rudd's resignation was "acrimonious and hostile." *Id.*

On May 11, 1995 CML received for testing two tissue samples from a patient. One of these samples was lost by Dr. William Janes, who was an employee of both CML and PNMA, and who had remained friendly with the departed Dr. Rudd. *Id.* at 2–3. Rather than report the loss to the patient and/or CML administrators, Janes instructed a CML histotechnologist under his supervision to replace the patient's lost tissue sample with that of another patient. *Id.* at 2. On approximately May 15, CML administrators learned of the illicit replacement and commenced an investigation. Between May 15 and June 2, CML completed its investigation of the incident, fired Janes, performed a pathological evaluation of the remaining sample, and prepared an amended report that noted the lost sample. *Id.* at 3. The patient was not contacted regarding this incident by either CML or PNMA. Rudd, however, learned of the incident from Janes and from the histotechnologist under Janes' supervision. *Id.*

During late May, June, and July of 1995, the family of the patient whose tissue sample was misplaced received a number of anonymous phone calls in which the caller discussed the events which had taken place with the sample. *Id.* PNMA asserts, based on the information the anonymous caller possessed about the tissue sample incident and about PNMA in general, that these calls were made by Rudd, and that his statements were defamatory.[2] *Id.* at 3–4. The caller stated during the phone calls that:

---

1. In accordance with this principle, the *Background* section which follows assumes the factual accuracy of the allegations in the complaint for purposes of this motion only: we will dispense with qualifying terms such as "allegedly," but the statements herein should not be understood as representing factual findings by this court.

2. In his first complaint, Patlovich neglected to plead that the statements made on the phone were false. After receiving Rudd's motion to dismiss, Patlovich corrected this omission by filing an amended complaint. Because the amended complaint is otherwise virtually identical to the original, Rudd elected to proceed with his

(1) Dr. Janes' loss and substitution of the patient's tissue sample was an example of a "common occurrence" because the physicians at PNMA were routinely unethical;

(2) quality control at PNMA was very poor because the physicians were more concerned with running a high volume practice which would generate a high profit; and

(3) in recent years Patlovich began to sacrifice the quality of the laboratory in order to generate higher profits.

*Id.* at 9.

Beginning in early June 1995, hundreds of anonymous letters and notes were sent, either by Rudd alone or in conjunction with others, to various hospitals, medical laboratories, Trustees of the American Pathology Foundation, and others with whom Patlovich had a professional relationship. *Id.* at 4, 7. The letters appended to the complaint contain the following statements, which Patlovich suggests are false or distorted:

(1) "This memo details the account of the unethical behavior of Drs. Janes and Bradley and the subsequent attempted coverup by Dr. Patlovich and his pathology group. . . . In fact many administrators even now do not know the full extent of the . . . coverup." *Id.* at 5–6 & Pl.'s Ex. B.

(2) "It was not until Dr. Patlovich analyzed the situation with his lawyers that it was told to Dr. Bradley that he had to deny any part in the case to protect the entire pathology group from possible dismissal. It was then decided Dr. Janes was to be the fall guy." *Id.* at 6 & Pl.'s Ex. B.

(3) "We feel that Dr. Patlovich must resign immediately. . . . His behavior in this situation was reprehensible and completely self-serving." *Id.*

(4) " 'They'll never find out' and 'fix it later' attitudes have been the continuous styles of the pathology group over recent years." *Id.* & Pl.'s Ex. A.

(5) "Past and present employees have related the following incidents/transgressions/improper conduct/unethical medical behavior by present and former members of Pathology and Nuclear Medicine Associates." The letter then lists a number of alleged "incidents" involving PNMA staff, such as the claim that "[a] former chief of pathology . . . once ordered several pathologists to keep quiet about a false diagnosis of cancer on a patient. . . ." *Id.* & Pl.'s Ex. C.

Patlovich asserts that the above statements by Rudd are defamatory *per se* because they falsely criticize his professional integrity and competence. *Id.* at 5. Additionally, Patlovich claims that by publicizing these statements Rudd violated a non-disparagement clause in his severance agreement, which states: "You agree that you will not at any time engage in any action either directly or indirectly that disparages or results in the disparagement of PNMA, its shareholders or employees." *Id.* at 8 & Pl.'s Ex. D. We consider each of these claims in turn.

### III. Defamation

■■ Under Illinois law,[3] a statement is defamatory "if it tends to harm the reputation of another such that it lowers that person in the eyes of the community or deters third parties from associating with him." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 180 Ill.Dec. 307, 312, 607 N.E.2d 201, 206 (1992) (citing Restatement (Second) of Torts § 559 (1977)). A statement will be considered defamatory *per se*—thereby rendering a showing of special damages unnecessary—if "the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed." *Id.* (citing *Owen v. Carr*, 113 Ill.2d 273, 100 Ill.Dec. 783, 497 N.E.2d 1145 (1986)). Illinois courts have recognized four types of statements that are considered defamatory *per se:* "(1) words that impute the commission of a criminal offense; (2) words that impute infec-

original motion to dismiss, though we will consider his motion in light of the amended complaint.

**3.** The parties agree that Illinois law applies to this case. Illinois law applies the same rules to libel and slander claims, *see Harris Trust & Sav.*

*Bank v. Phillips*, 154 Ill.App.3d 574, 107 Ill.Dec. 315, 318, 506 N.E.2d 1370, 1373 (1987), so even though Patlovich presents these claims in separate counts of his complaint we will address them together.

tion with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; or (4) words that prejudice a party, or impute lack of ability, in his or her trade, profession or business." *Id.* (citing *Costello v. Capital Cities Communications, Inc.*, 125 Ill.2d 402, 126 Ill.Dec. 919, 532 N.E.2d 790 (1988)).

▮ Patlovich argues that Rudd's statements impute to him both a want of integrity and a lack of professional ability, thereby bringing the statements within the third and fourth categories of defamation *per se*. *See* Pl.'s Compl. at 5–6. In response, Rudd refers us to precedent indicating that "a statement is incapable of defamatory construction when the underlying subject matter is medical science." *Aroonsakul v. Shannon*, 279 Ill.App.3d 345, 216 Ill.Dec. 166, 172, 664 N.E.2d 1094, 1100 (1996). We do not think this principle is applicable to the statements made by Rudd. His comments were not made pursuant to a debate about "medical science" or the "proper treatment for a patient," *cf. Anderson v. Matz*, 67 Ill.App.3d 175, 23 Ill.Dec. 852, 854, 384 N.E.2d 759, 761 (1978), but rather were submitted anonymously in a manner clearly designed to "impute an inability to perform or want of integrity" to Patlovich. The heightened protection Illinois courts provide to statements made in the context of genuine disagreements about medical science does not extend to anonymous attacks. *Cf. Barakat v. Matz*, 271 Ill.App.3d 662, 208 Ill.Dec. 111, 120, 648 N.E.2d 1033, 1042 (1995) (holding remarks by one doctor about another defamatory where the remarks "clearly and directly concern[ed] the plaintiff's professional conduct and character"). Thus, as an initial matter Rudd's statements appear capable of being found defamatory *per se*. Rudd, however, raises a number of other objections that he believes render each statement non-defamatory as a matter of law. We consider these objections below.

### A. The Innocent Construction Rule

▮ Illinois courts apply an "innocent construction rule" to defamation cases. Under this rule, "a written or oral statement is

to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*." *Chapski v. Copley Press*, 92 Ill.2d 344, 65 Ill.Dec. 884, 888, 442 N.E.2d 195, 199 (1982). The initial determination as to whether a particular statement may be reasonably interpreted in these ways is for the court, but whether it was in fact so interpreted by its audience is a question for the jury. *See id.*; *Rosner v. Field Enterprises, Inc.*, 205 Ill. App.3d 769, 151 Ill.Dec. 154, 175, 564 N.E.2d 131, 152 (1990). Thus, in the context of this motion to dismiss we must determine (1) whether Rudd's statements can be reasonably interpreted as referring to someone other than Patlovich, and (2) if not, whether they are nevertheless susceptible to a reasonable "innocent" interpretation. ·

### 1. reference to plaintiff

▮ Rudd argues that three of his written statements and some of his remarks on the phone are legally incapable of being defamatory because they do not specifically refer to Patlovich. As support for this argument, Rudd refers us to several Illinois cases that focused on the fact that the plaintiff was not named in the allegedly defamatory material as a reason for concluding that *per se* liability was inappropriate. *See, e.g., Barry Harlem Corp. v. Kraff*, 273 Ill.App.3d 388, 210 Ill.Dec. 101, 104, 652 N.E.2d 1077, 1080 (1995); *Homerin v. Mid–Illinois Newspapers*, 245 Ill.App.3d 402, 185 Ill.Dec. 362, 364–65, 614 N.E.2d 496, 498–99 (1993); *Schaffer v. Zekman*, 196 Ill.App.3d 727, 143 Ill.Dec. 916, 919, 554 N.E.2d 988, 991 (1990). These cases are inapposite, however, when the larger context from which a particular comment has been excerpted clearly refers to the plaintiff. The rule articulated in *Chapski* bars *per se* liability only if the statement may be "*reasonably* interpreted as referring to someone other than the plaintiff." *Chapski*, 65 Ill.Dec. at 888, 442 N.E.2d at 199 (emphasis added); *see also Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d

1345, 1349 (7th Cir.1995) (applying Illinois law and holding that identification is sufficient "if the audience would be likely to think that the defendant was talking about the plaintiff"); *Stevens v. Tillman,* 855 F.2d 394, 397 (7th Cir.1988) ("A statement that logically refers to a particular person may be actionable."); *Aroonsakul v. Shannon,* 279 Ill. App.3d 345, 216 Ill.Dec. 166, 170, 664 N.E.2d 1094, 1098 (1996) (same). We do not think defendants can circumvent this principle by the simple expedient of selectively quoting from statements so that reasonably clear references to the plaintiff are eliminated. The cases cited by Rudd indicate that whether the plaintiff's name was used in a communication is an important indicator of whether it may be "reasonably interpreted as referring to someone other than the plaintiff," but failure to include the plaintiff's name does not necessarily preclude *per se* liability if the plaintiff is clearly identified in some other way.

All but one of the allegedly defamatory communications by Rudd contain a clear reference to Patlovich. The first challenged statement—"It was not until Dr. Patlovich analyzed the situation with his lawyers that it was told to Dr. Bradley that he had to deny that he had any part in the case" (Pl.'s Ex. B)—explicitly refers to Patlovich. The second—"'They'll never find out' and 'fix it later' attitudes have been the continuous styles of the pathology group over recent years" (Pl.'s Ex. A)—is found in a letter which specifically uses Patlovich's name. *See* Pl.'s Ex. A (letter to Laudick and Finn). Finally, at least one of the allegedly slanderous statements made on the telephone by Rudd appears to have referred to Patlovich by name. Although discovery may reveal that certain phone conversations contained no reference to Patlovich—thereby rendering judgment as a matter of law in favor of Rudd appropriate—a liberal reading of the complaint indicates that Patlovich's name was used in these conversations, and that is sufficient to satisfy the reasonable identification requirement.

■ The statement from Plaintiff's Exhibit C—"Past and present employees have related the following incident/transgressions/improper conduct/unethical medical behavior by present and former members of [PNMA]"—is a different story. This letter contains absolutely no reference to Patlovich. Patlovich argues that the phrase "members of [PNMA]" is sufficiently precise to be considered a reference to him; PNMA consists of only 10 doctors, Pl.'s Response Br. at 13–14, and given that Patlovich was PNMA's President it is quite possible that recipients of Rudd's letter would think of him when reading Rudd's list of "transgressions." But our examination of Exhibit C leads us to believe that a reasonable reader could conclude that the alleged acts of misconduct were committed by "someone other than the plaintiff." Several of the alleged acts of misconduct are attributed to particular doctors, but none to Patlovich. The author of the letter was quite willing to attack authority figures such as the Chief of Pathology and the Chief of Staff at Highland Park Hospital, but there is no reference to the President of PNMA. On its face, the letter provides no reason for a reader to conclude that Patlovich personally knew of, participated in, or condoned any of the alleged misconduct. Accordingly, Rudd's motion to dismiss is granted with respect to the statements in Plaintiff's Exhibit C.[4]

### 2. *innocent interpretation*

■ Rudd also argues that one of his written statements is susceptible to a reason-

**4.** Patlovich also contends that Rudd's letters should be read together as a single publication rather than as independent statements. Many of the anonymous letters—including the one in Plaintiff's Exhibit C—conclude with the statement "More to Come!," perhaps indicating that they were parts of a coherent whole. Viewed in this light, the lack of specific reference to Patlovich in Exhibit C would be irrelevant because other communications from Rudd specifically name Patlovich. But although this argument has some force, we are not persuaded by it. Whether the letters properly can be viewed as a coherent whole depends on a number of unresolved questions of fact, such as whether the letters were all sent within a short time period, and whether all of the recipients received all of the letters. When a defamatory statement can only be connected to the plaintiff by proof of facts extrinsic to the statement, the appropriate action is defamation *per quod,* not *per se. See* Mittelman *v.* Witous, 135 Ill.2d 220, 142 Ill.Dec. 232, 238, 552 N.E.2d 973, 979 (1989).

able innocent interpretation.[5] A statement is "innocent" if it is "capable of a nondefamatory interpretation, given its verbal or literary context." *Mittelman v. Witous,* 135 Ill.2d 220, 142 Ill.Dec. 232, 238, 552 N.E.2d 973, 979 (1989). In making this determination, we consider only "reasonable" interpretations: we need not "strain to find unnatural but possibly innocent meanings of words where such a construction is clearly unreasonable and a defamatory meaning is far more probable." *Chapski v. Copley Press,* 92 Ill.2d 344, 65 Ill.Dec. 884, 887, 442 N.E.2d 195, 198 (1982).

■ The statement Rudd suggests is susceptible to an innocent interpretation is: "It was not until Dr. Patlovich analyzed the situation with his lawyers that it was told to Dr. Bradley that he had to deny any part in the case to protect the entire pathology group from possible dismissal. It was then decided that Dr. Janes was to be the fall guy." Def.'s Br. at 10 (quoting from Pl.'s Ex. B). The literary context in which this sentence is found is an anonymous letter, which begins by announcing its intention to describe "the unethical behavior of Drs. Janes and Bradley and the subsequent attempted coverup by Dr. Patlovich."[6] Pl.'s Ex. B. The letter also makes clear that the author believes that Bradley actually was involved in Dr. Janes' substitution of tissue samples, thus implying that Patlovich—after conferring with counsel—advised Bradley to lie. Given this context, we think the natural reading of Rudd's statement is defamatory rather than innocent: it suggests that Patlovich violated ethical standards by encouraging other doctors to lie, concealing information relevant to a patient's medical treatment, and unjustly scapegoating a member of his staff.[7]

## B. The Opinion Rule

■ Only statements of fact are capable of being defamatory; statements of opinion are protected by the First Amendment. *See Mittelman,* 142 Ill.Dec. at 241, 552 N.E.2d at 982 (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974)). In distinguishing fact from opinion, Illinois courts have combined two approaches: the Restatement (Second) of Torts approach, and the four-factor test from *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984). *Id.* at 983–84. The Restatement first articulates the general principle that statements of fact "usually concern the conduct or character of another." Restatement (Second) of Torts § 565 cmt. a. Then the Restatement distinguishes between "pure opinion," which is protected by the First Amendment, and "mixed opinion," which is actionable.

> There are two kind of expression of opinion. The simple expression of opinion, or the pure type, occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character.
>
> . . . .
>
> The second kind of expression of opinion, or the mixed type, is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication.

Restatement (Second) of Torts § 566 cmt. b. The *Ollman* opinion augments the Restatement's approach by establishing four issues for courts to consider in distinguishing fact

---

**5.** Rudd also contends that the statements in Plaintiff's Exhibit C are susceptible of an innocent construction, but we need not consider this argument since we have already concluded that they cannot be defamatory *per se. See supra* Part III.A.1.

**6.** One judge has argued that the term "coverup" carries such negative connotations that it is nearly certain to be defamatory. *See Bressler v. Fortune Magazine,* 971 F.2d 1226, 1250 n. 10 (6th Cir.1992) (Batchelder, J., dissenting) ("The term 'coverup' . . . is particularly defamatory because

of its connotation in post-Watergate American society. A coverup indicates not only ethical or moral wrongdoing, but illegal activity.").

**7.** Rudd suggests that the use of the passive voice in this statement ("it was told to Dr. Bradley") means that the statement does not necessarily implicate Patlovich in any wrongdoing. Def.'s Br. at 9–11. We find this interpretation strained and unreasonable. The context of the statement clearly implies that Patlovich told Bradley to deny involvement in the tissue switch.

from opinion: (1) whether the statement has a precise core of meaning; (2) whether the statement is objectively verifiable; (3) whether the literary context of the statement implies that the statement has factual content; and (4) whether the broader social context in which the statement appears signals a usage as either fact or opinion. *Ollman*, 750 F.2d at 979.

Rudd contends that three of his written statements and his remarks on the phone are protected expressions of opinion. The first statement is from Plaintiff's Exhibit B: "This memo details the account of the unethical behavior of Drs. Janes and Bradley and the subsequent attempted coverup by Dr. Patlovich and his pathology group.... In fact many administrators even now do not know the full extent of the ... coverup." Rudd suggests that this statement is a "pure" opinion because it is a conclusion based on facts set forth in the letter. *See* Def.'s Br. at 5–6. A reading of Exhibit B, however, clearly refutes this argument. Rather than a complete description of what Patlovich might be "covering up," the letter contains mysterious references to "the situation" involving the tissue sample switch, drops vague hints about Patlovich's meetings with his lawyers, and speculates regarding his motivations for keeping the affair secret. These implications of unstated facts bring the statement within the Restatement's definition of "mixed" opinions, which are actionable. Moreover, the factors specified in *Ollman* reinforce the notion that Rudd's accusation that Patlovich participated in a "coverup" is closer to fact than opinion. The term "coverup" has a precise core of meaning: the American Heritage Dictionary (2d ed.1983) defines it as "an effort or strategy designed to conceal something, such as a crime or scandal." The assertion that Patlovich was engaged in a coverup is certainly verifiable. And the context of this statement—an anonymous letter purporting to reveal scandalous conduct—would indicate to the average reader that the author intended to convey factual information.

A second statement challenged by Rudd is from Plaintiff's Exhibit A: "They'll never find out' and 'fix it later' attitudes have been continuous styles of the Pathology Group over recent years." *See* Def.'s Br. at 12. The assertion that members of the Pathology Group held these attitudes is plainly verifiable. In fact, the letter itself emphasizes the verifiability of the statement's characterization of the pathologists' attitudes. It says to its recipients, "You are encouraged to go back and review past information on quality issues and lab incidents.... Look at the pathologists' representations and compare it to experience. The pattern will get obvious." Pl.'s Ex. A. In the context of these accompanying remarks, this statement is clearly one of fact rather than opinion.

Rudd also contends that his anonymous phone comments are mere opinion. In the phone calls he stated that:

(1) Dr. Janes' loss and substitution of the patient's tissue sample was an example of a "common occurrence" because the physicians at PNMA were routinely unethical;

(2) quality control at PNMA was very poor because the physicians were more concerned with running a high volume practice which would generate a high profit; and

(3) in recent years Patlovich began to sacrifice the quality of the laboratory in order to generate higher profits.

Pl.'s Compl. at 9. Rudd contends that these statements are "not susceptible of being proved right or wrong." Def.'s Br. at 17. We disagree. The frequency of unethical behavior at PNMA, the effectiveness of PNMA's quality control procedures, and the existence of recent changes in the quality of service at PNMA are all ascertainable, verifiable phenomena. And as with the other statements, the context in which these ideas were communicated to the audience suggests that the speaker was attempting to convey facts.[8]

---

8. It is possible that the specific phrases which conjecture about the motives of Patlovich and the PNMA physicians—those that suggest they were motivated by a desire for higher profits—might fairly be characterized as opinion. But the primary thrust of these statements is the essentially factual assertion that PNMA had poor quality control and unethical physicians.

We think that Rudd's opinion objection is well taken only with respect to one statement from Exhibit B: "We feel that Dr. Patlovich must resign immediately and permanently as medical director of CML. His behavior in this situation was reprehensible and completely self-serving." The first sentence is just a statement of the author's "feeling" about how Patlovich should respond to the tissue sample incident. The second sentence simply puts subjective labels ("reprehensible" and "self-serving") on the cover-up described, however vaguely, earlier in the letter. Neither sentence adds any new facts to those already detailed in the body of the letter. Furthermore, the context of this statement—at the end of a letter containing a number of factual assertions—indicates clearly that the author is drawing a conclusion from the facts presented. Thus, the statement falls within the Restatement's definition of "pure opinion," and Rudd's motion to dismiss is granted with respect to it.

### C. Qualified Privilege

Rudd argues that the comments he made in his anonymous phone calls to the family of the patient whose tissue sample was lost are not actionable because they are subject to a qualified privilege. Def.'s Br. at 20. Qualified privileges are "based on a policy of protecting honest communications of misinformation in certain favored circumstances in order to facilitate the availability of correct information." *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill.2d 16, 188 Ill.Dec. 765, 769, 619 N.E.2d 129, 133 (1993). Under Illinois law, a qualified privilege exists when: (1) some interest of the person who publishes the defamatory matter is involved; (2) some interest of the person to whom the matter is published or of some other person is involved; or (3) a recognized interest of the public is involved. *See id.* 188 Ill.Dec. at 770–71, 619 N.E.2d at 134–35 (citing S. Harper et al., The Law of Torts § 5.25, at 216 (2d ed.1986)). An abuse of the privilege occurs when the defendant acts with "a direct intention to injure another, or . . . a reckless disregard of [the defamed

party's] rights and of the consequences that may result to him." *Id.* 188 Ill.Dec. at 771, 619 N.E.2d at 135 (internal quotation marks omitted). The existence of a qualified privilege is a question of law for the court, whereas whether the privilege was abused is a question of fact for the jury. *See id.* 188 Ill.Dec. at 769, 619 N.E.2d at 133.

We agree with Rudd's contention that a qualified privilege applies to his phone conversations with the patient's family. The statements to the family about the quality of care offered by PNMA were clearly related to an "interest of the person to whom the matter is published." But we also think that Patlovich has alleged sufficient facts in his complaint to support his assertion that Rudd acted with "a direct intention to injure" or in "reckless disregard" of Patlovich's rights,[9] which would constitute an abuse of the privilege. For instance, the anonymous nature of the calls, the fact that the subjects discussed encompassed much more that just the tissue switch, and the fact that the patient's family was called repeatedly, are arguably probative of an intent to injure Patlovich's reputation rather than merely to inform the family about the tissue replacement incident. Because Patlovich has adequately pleaded abuse of the privilege, we cannot grant Rudd's motion to dismiss on grounds of qualified privilege.

## IV. Breach of Contract

In addition to his defamation claims, Patlovich also contends that Rudd breached the non-disparagement clause of his severance agreement, which states in pertinent part:

> You agree that you will not at any time engage in any action either directly or indirectly that disparages or results in the disparagement of PNMA, its shareholders or its employees. In addition, you agree to refrain from disclosing any aspect of PNMA's financial or other business operations or practices to anyone unless compelled to do so by judicial process unless

---

**9.** This assertion was not included in the original complaint, but was added when Patlovich amended his complaint subsequent to the filing of Rudd's motion to dismiss. *See* Pl.'s Am. Compl. at 9.

you have obtained PNMA's prior written approval to do so.

Pl.'s Compl. Ex. D.[10]

 Rudd makes two arguments for dismissal of this claim.[11] First, he contends that the non-disparagement clause of the agreement is void as contrary to Illinois public policy. A court may refuse to enforce contractual provisions on policy grounds, but only if the provision "expressly contravenes the law or a known public policy of this State, as public policy itself strongly favors freedom to contract." *Rome v. Upton*, 271 Ill.App.3d 517, 208 Ill.Dec. 163, 166, 648 N.E.2d 1085, 1088 (1995). We agree with Rudd's assertion that Illinois cases have articulated a public policy in favor of protecting open communication by physicians about the quality of medical services and patient care. *See, e.g., Aroonsakul v. Shannon*, 279 Ill.App.3d 345, 216 Ill.Dec. 166, 171–72, 664 N.E.2d 1094, 1099–1100 (1996); *Anderson v. Matz*, 67 Ill. App.3d 175, 23 Ill.Dec. 852, 854, 384 N.E.2d 759, 761 (1978). We do not believe, however, that this public policy can be stretched so far as to encompass anonymous attacks that are distributed to "hundreds" of recipients (*see* Pl.'s Compl. at 7); such communications are not reasonably related to patient treatment or to the improvement of medical care.

 Rudd's second argument for dismissal of Patlovich's breach of contract claim is that his comments were not disparaging as a matter of law "for the same reasons they are not defamatory." Def.'s Br. at 15. There is, however, no reason why a statement must be defamatory in order to "disparage" as that term is used in the parties' severance agreement.[12] The meaning of "disparage" must be determined by reference to ordinary principles of contract interpretation. In the absence of any argument by the parties on this point, we see no reason why "disparage" should not be given its ordinary, non-technical meaning: "to speak of in a belittling way; to reduce in rank or esteem." *Webster's New Riverside University Dictionary* 387 (1984). Given this definition, we think it is self-evident that the statements of which Patlovich complains constitute disparagement.

## V. Conclusion

For the foregoing reasons, the defendant's motion to dismiss is denied as to all three counts of the complaint, though it is granted with respect to certain specific statements as noted. It is so ordered.

---

10. The parties agree that Patlovich has standing to sue as a third-party beneficiary of this contract. *See* Def.'s Br. at 13 n. 3; Pl.'s reply Br. at 16.

11. Rudd also argues that Patlovich has not identified any particular statements that disparage him, but this argument merits little discussion. Count II of the Complaint incorporates the allegations made in the context of Patlovich's defamation claims: thus, the same comments alleged to be defamatory are alleged to be disparaging. *See* Pl.'s Compl. at 8.

12. Rudd refers us to cases that discuss the similarities between defamation claims and "commercial disparagement" claims, *see* Def.'s Br. at 15, but these cases are not on point because Patlovich's claim is for breach of contract rather than *commercial disparagement*. There is no reason to believe that the use of the word "disparage" in the severance agreement was meant to be equivalent to "commercial disparagement"—a term of art.