# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-2631

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellee,*

*v.*

SEVERN TRENT SERVICES, INC.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 3337—**Robert W. Gettleman**, *Judge.*

_____

ARGUED JANUARY 12, 2004—DECIDED FEBRUARY 10, 2004

_____

Before POSNER, EASTERBROOK, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.* Severn Trent Services appeals from the grant to the EEOC of an injunction against Severn's "enforcing or threatening or attempting to enforce any provision of any contract . . . which prohibits or purports to prohibit Kevin Murphy . . . from participating in the EEOC's investigation and processing of" a charge filed with the Commission by a former employee of Severn named Petolick, or from "providing any information, testimony, and documents to EEOC in connection" with the investigation.

Murphy had sold his business, which was called Hydra-Stop and employed Petolick, to Pitometer Associates, Inc. In connection with the sale, he had signed a consulting agreement with Pitometer that contained a nondisparagement clause forbidding him "directly or indirectly, in public or private, [to] deprecate, impugn or otherwise make any remarks that would tend to or could be reasonably construed to tend to defame" Pitometer or its affiliates, officers, or employees.

Such private gag orders appear to be fairly common. Wayne N. Outten, "Negotiations, ADR, and Severance/ Settlement Agreements: An Employee's Lawyer's Perspective," 604 *PLI/Lit* 235, 316-17 (1999); see, e.g., *Patlovich v. Rudd*, 949 F. Supp. 585, 594-95 (N.D. Ill. 1996) (Illinois law); *Eichelkraut v. Camp*, 513 S.E.2d 267, 268 (Ga. App. 1999). Naturally an employer doesn't want to be bad-mouthed by a disgruntled employee who may be privy to the employer's dark secrets—especially in a case such as this in which a person sells his firm and may intend to reenter the business and seek a competitive advantage by disparaging the firm's buyer. Cf. John L. Hines, Jr., Michael H. Cramer & Peter T. Berk, "Anonymity, Immunity & Online Defamation: Managing Corporate Exposures to Reputation Injury," 4 *Sedona Conf. J.* 97, 106 (2003); Laurence H. Reece III, "Valuation and Settlement of Business Disputes," in *Winning Through Settlement: Valuation and Settlement of Business Disputes* § 6.5 (Paul G. Garrity ed., Massachusetts Continuing Legal Education, Inc. 2001). The nondisparagement clause in the consulting agreement may thus have been a substitute for a noncompete clause, which would be unenforceable if its duration were "unreasonable," as it might be under Illinois law (which governs disputes arising under the agreement) if it exceeded two or three years, and almost certainly if it exceeded five. Com-

pare *Midwest Television, Inc. v. Oloffson*, 699 N.E.2d 230, 235 (Ill. App. 1998), and *Fister/Warren v. Basins, Inc.*, 578 N.E.2d 37, 41 (Ill. App. 1991), with *Eichmann v. National Hospital & Health Care Services, Inc.*, 719 N.E.2d 1141, 1148 (Ill. App. 1999), and *Hamer Holding Group, Inc. v. Elmore*, 613 N.E.2d 1190, 1197-1201 (Ill. App. 1993). Although the term of the consulting agreement itself was only three years, the nondisparagement clause is by its terms perpetual, which appears to be common, see, e.g., *Patlovich v. Rudd*, *supra*, 949 F. Supp. at 594-95, and, so far as we are aware, unexceptionable. A related provision of the agreement forbids Murphy to solicit or hire any employees of Pitometer or its affiliates for two years after his consultantship terminates.

The defendant, however, is Severn, not Pitometer. Pitometer is not a party to this lawsuit. When and how did Severn come into the picture? We know that Murphy was working for Severn by September of 2002 at the latest, for it was then that the EEOC subpoenaed him to testify concerning Petolick's charge, and the subpoena designates him as an executive vice-president of Severn. Also according to the charge, Hydra-Stop was already part of Severn in June 2000 even though the consulting agreement, which was between Murphy and Pitometer, not Severn, recites that it is effective from May 31, 2000. It seems that overnight Pitometer turned into Severn. In fact we'll see later in this opinion that Murphy's relationship with Severn dated from Pitometer's acquisition of Hydra-Stop and that Pitometer, despite the "Inc." after its name, may be a division of Severn and, if not, is a subsidiary—and was in May and June of 2000.

The consulting agreement either expired or was terminated during this litigation. Murphy no longer works for Severn or, so far as appears, has any other relationship with

the company. The vagueness of the record in these and other respects is notable.

Murphy told the EEOC that he wouldn't comply with the subpoena because Severn had refused to assure him that it would not sue him for breach of the nondisparagement clause if he cooperated with the Commission. The Commission could have sought and obtained judicial enforcement of the subpoena, since obviously Murphy could not by signing a contract excuse or disable himself from testifying. *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743-45 (1st Cir. 1996); *Camp v. Eichelkraut*, 539 S.E.2d 588, 597-98 (Ga. App. 2000); cf. *EEOC v. Indiana Bell Telephone Co.*, 256 F.3d 516, 521-24 (7th Cir. 2001) (en banc); *Baker v. General Motors Corp.*, 522 U.S. 222, 238-41 (1998); *Hartlep v. Torres*, 756 N.E.2d 371, 373 (Ill. App. 2001). But instead it wrote Severn asking the company to give Murphy "an enforceable waiver or amendment to the consulting agreement indicating that Severn Trent will not take action against him for any statements he might make to the EEOC in connection with its investigation" of Petolick's charge. Severn replied by expressing puzzlement that the Commission hadn't sought to enforce the subpoena and stating that "Severn Trent has taken no action, nor does its agreement with Mr. Murphy purport to restrain him from participating in any EEOC proceeding. Accordingly, Severn Trent will not waive a negotiated provision of an agreement, made in connection with the sale of a business and totally unrelated to this or any other EEOC proceeding or charge of discrimination."

The Commission then filed this suit for injunctive relief pursuant to 42 U.S.C. § 2000e-5(f)(2), which authorizes the agency to seek such relief in aid of its investigations when "prompt judicial action is necessary to carry out the purposes" of Title VII. *Ahearn v. Jackson Hospital*, 351 F.3d 226,

235 and n. 1 (6th Cir. 2003); *EEOC v. Pacific Press Publishing Ass'n*, 535 F.2d 1182, 1184-85 (9th Cir. 1976). The district judge did not issue a written opinion explaining the basis for his decision to grant the injunction but in oral remarks said that Severn Trent "has basically conceded that . . . it [is] intend[ing] to use that provision of the contract [that is, the nondisparagement clause] to prohibit Mr. Murphy from going beyond the legitimate bounds of the investigation itself." This sounds like a point *against* the grant of an injunction, since the EEOC has no right to question Murphy about matters that are "beyond the legitimate bounds of the investigation" of Petolick's complaint. But no. The judge said that "because the parties were for some inexplicable reason unable to work this out themselves . . . [a]nd I said I would issue the injunction, . . . I will."

At a previous hearing the judge had expressed exasperation at Severn's refusal to give Murphy a blanket assurance that he wouldn't be sued. The judge said that Murphy "is willing to show up [to be questioned by the EEOC], he just doesn't want to be hammered by your client [i.e., Severn], and I don't blame him." The assurance the government was seeking, however, was that Severn "will not enforce the non-disparagement provision based on *any* information he provides to us" (emphasis added). That was too broad. Later the demand was narrowed, but ambiguously, to "communications with the EEOC in the context of our investigation of the charge." Severn's lawyer then told the judge that "perhaps the parties could work out what that ['the context of our investigation'] means exactly." The hearing was adjourned to let the parties work it out. They didn't work it out (we don't know what the stumbling block was), so the judge issued the injunction.

That is all we can find in explanation of the judge's action, except for his repeating when he issued the injunction that

"the EEOC wants to talk to Mr. Murphy. Mr. Murphy feels that he is being prohibited by this contract and is under the threat of suit."

The judge's impatience is understandable, but he was too abrupt. An injunction so poorly buttressed by explanation flunks Fed. R. Civ. P. 65(d), which provides that "every order granting an injunction and every restraining order shall set forth the reasons for its issuance." See also Fed. R. Civ. P. 52(a); 7th Cir. R. 50; *Advent Electronics, Inc. v. Buckman*, 112 F.3d 267, 272-74 (7th Cir. 1997); *Weitzman v. Stein*, 897 F.2d 653, 658 (2d Cir. 1990). The explanation can be oral rather than written, as in *Six Clinics Holding Corp. v. Cafcomp Systems, Inc.*, 119 F.3d 393, 400-01 (6th Cir. 1997), and the absence of explanation can be forgiven when the justification for the injunction is clear from the record. *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996); *Hsu By and Through Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 848 n. 1 (2d Cir. 1996); *Sunray DX Oil Co. v. Helmerich & Payne, Inc.*, 398 F.2d 447, 450 (10th Cir. 1968); cf. *Ross Brothers Construction Co. v. International Steel Services, Inc.*, 283 F.3d 867, 872 (7th Cir. 2002). But it is not clear in this case.

If Severn merely wanted to prohibit Murphy from making gratuitous disparagements of it—disparagements wholly unrelated to the Petolick investigation—there would be no cause for an injunction unless Murphy or the Commission had evidence that Severn meant to sue him regardless of what he said to the Commission, in order to deter signatories to the company's nondisparagement clauses from cooperating in government investigations of the company. Such suits would be frivolous, since a nondisparagement clause can no more trump a subpoena issued by a government agency than any private contract could. (The contract explicitly, if unnecessarily, disclaims any intention that it be

enforced beyond the limits permitted by law.) Indeed, they would be beyond frivolous; they would be obstructions of justice. See *Yockey v. Horn*, 880 F.2d 945, 950-51, 953 (7th Cir. 1989). But we don't even know whether Severn is a party to any other contracts that contain a nondisparagement clause and so may have a policy of using such clauses to intimidate potential witnesses. And Severn claims to "have information from the witness that he plans to share things unrelated to the underlying charge . . ., in breach of his agreement." The judge did not attempt to determine whether this is true.

Analysis is complicated, however, by a specious argument by Severn that casts doubt on its good faith—namely that it is not a party to the agreement containing the non-disparagement clause and has not been shown to be a third-party beneficiary either. Were this true, it would support an inference that Severn's refusal to offer a blanket waiver of its rights under the agreement had indeed been intended to intimidate Murphy, for the refusal would imply that Severn was prepared to sue him to enforce rights that it knew it didn't have. The argument may reflect a tendency of lawyers to multiply arguments without always considering the effect on the coherence or persuasiveness of their overall position. The effect in this case is to create an acute problem of coherence because at the same time that Severn argues that it is "not a party to the Consulting Agreement[,] . . . had no control over the Non-Disparagement Provision when the Consulting Agreement was signed and cannot waive the provision now [and]. . . is [not] a successor in interest to Pitometer," it insists that "to the extent Mr. Murphy's communications with the EEOC are *not* privileged or otherwise protected by federal or state law, the terms of the Non-Disparagement Provision are enforceable. . . . For example, Mr. Murphy does not have the right to intention-ally and maliciously defame Severn Trent about matters

wholly unrelated to the Petolick Charge just because he is appearing before the EEOC. The EEOC's proposed injunction would prevent enforcement of the Non-Disparagement Provision even under these circumstances" (emphasis in original). Notice how the potentially defamed party is identified as Severn, not Pitometer. Recall too how in its letter to the EEOC Severn had referred to the consulting agreement as "its" agreement and how it had also said in the letter that it "will not waive" the nondisparagement clause.

Severn's argument that it is not bound by the contract with Murphy leaves us breathless. The press release that Severn issued announcing the purchase of Hydra-Stop is captioned "Hydra-Stop Acquired by Severn Trent Services, Inc.'s Pipeline Services Group" and states that "Severn Trent Services, Inc. announced today that it has acquired Hydra-Stop, a pipeline products and services company with special expertise in water pipelines, serving industry and municipalities worldwide. Hydra-Stop will become a part of the Pitometer Pipeline Services Group of Severn Trent Services, Inc. Kevin Murphy, President of Hydra-Stop stated, 'Severn Trent Services, Inc. is an excellent fit for our products and services because of its breadth of capabilities in both water and wastewater.'" From these and other documents it appears that Pitometer is actually a division of Severn rather than a corporate subsidiary. It appears that Pitometer Associates, Inc. was acquired by Severn in 1996 (long before the acquisition of Hydra-Stop), but later became either "Pitometer Pipeline Services Group" or just "Pipeline Services group," but in either case with no "Inc." after its name.

Pitometer is either Severn, or (as Severn unguardedly let slip in its reply brief, as it had earlier done in its letter to the

district court) an affiliate of Severn. Either way, it is clear that Murphy was working for Severn from the date of the acquisition of his company and that Severn whether directly or through orders to Pitometer would be entitled to enforce the consulting agreement, including its nondisparagement clause. Remarkably, both the EEOC and the district court failed to determine the relation between Pitometer, the nominal party to the contract, and Severn, the would-be enforcer.

Severn's equivocation concerning its contractual rights against Murphy is something for the district judge to consider on remand in deciding whether to issue an injunction. Had Severn unequivocally and irrevocably disclaimed all rights under the contract, so that it would unquestionably be estopped to ever try to sue Murphy for breach of the contract, there would be an argument not only that the injunction should not have been issued, *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 986 (9th Cir. 1991), but also and more fundamentally that there is no actual controversy before us. Severn could not be adversely affected by the injunction if it had precluded itself from ever suing to enforce the nondisparagement clause. It would be as if Severn's president had been enjoined from putting on a pair of wings and flying to Alpha Centauri. And while it is true that deliberately violating an injunction is punishable as criminal as well as civil contempt, trying to intimidate a witness is also criminal conduct; it is, as we pointed out, obstruction of justice.

We are mindful that unless an injunction is insufficiently precise to be enforced by contempt sanctions or is otherwise void, *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 646-47 (7th Cir. 2002); *Board of Education v. Illinois State Bd. of Education*, 79 F.3d 654, 657 (7th Cir. 1996); *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996), the person

enjoined can challenge it even if the fence that it erects around him does not actually restrain him because he has in any event no intention of straying outside the boundary marked by the fence. If someone obtained an injunction against a federal judge's joining the Nazi Party, and the judge challenged it, it would not be a defense that the judge had no present or potential interest in joining. That would be different, however, from a case in which a person was enjoined from doing something he couldn't possibly do. But that is not this case. Severn has not disclaimed its right to enforce the nondisparagement clause, let alone done so unequivocally and irrevocably, and so the injunction really is fencing Severn in.

This is true even though the EEOC could have subpoenaed Murphy to testify, and still can, with arguably the same effect on Severn as the injunction. If it makes no practical difference at all either to Severn or the judiciary which path of judicial relief is taken—enforcing the subpoena or enjoining Severn from interfering with Murphy's testifying—then, it may be asked, why remand the case for the entry of a further order, whether granting or denying an injunction, that would be likely to be appealed? That sounds like yo-yo jurisprudence. If the subpoena is enforced, Severn will be disabled from taking any step to retaliate against Murphy, as by trying to enforce the nondisparagement clause, so Severn seems not to be aggrieved by the injunction, and only an adversely affected or aggrieved party can get appellate relief. There are, however, differences between the two paths that may explain why Severn has appealed rather than just shrugging its shoulders in the belief that subpoena and injunction are equivalent. A subpoena would be directed at Murphy, not Severn, and Murphy might have and assert defenses against complying with the subpoena that would not

inculpate Severn. This possibility indicates that Severn may have something to gain from getting the injunction lifted. In addition, the injunction is, as we are about to see, both vague, and so may encourage Murphy to testify beyond the legitimate scope of the Commission's inquiry, and without limitation of time.

There are too many uncertainties to permit us to terminate the case. It must be returned to the district judge for further consideration of whether to enjoin Severn. Should the judge decide to reinstate the injunction, he should give it a more precise statement of scope than "in connection" with the Commission's investigation of Petolick's charge— such as "reasonably calculated to lead to evidence pertinent to" the investigation. "In connection with" might suggest that Murphy could say anything that came into his mind, provided only that he said it while testifying in the Commission's investigation of Petolick's charge. In addition, the injunction has to have a deadline, because 42 U.S.C. § 2000e-5(f)(2) authorizes only "temporary or preliminary relief pending final disposition of such [EEOC] charge." See *EEOC v. CNA Ins. Cos.*, 96 F.3d 1039, 1042-43 (7th Cir. 1996). The injunction must by its terms end when Petolick's charge is finally disposed of.

Of course an injunction so limited may not provide adequate relief, because Murphy may be afraid of being sued after as well as before Petolick's charge is resolved. This conjecture could be tested, and further disputes over the scope and limits of the injunction perhaps bypassed, by the Commission's moving for judicial enforcement of the subpoena—a course we urge. But should that route not be taken, or fail, we add that the possibility that Murphy may balk even if a proper section 2000e-5(f)(2) preliminary injunction is entered is not an insuperable objection to placing a time limit on that injunction (anyway that limitation

is dictated by the statute). The EEOC can obtain a permanent injunction (42 U.S.C. § 2000e-5(g)(1)) against Severn if Severn interferes with or retaliates against a participant (namely Murphy) in its investigation of Petolick's charge. For that would be a separate, permanently enjoinable violation of Title VII. 42 U.S.C. § 2000e-3(a); *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997); *Twisdale v. Snow*, 325 F.3d 950, 952-53 (7th Cir. 2003); *Deravin v. Kerik*, 335 F.3d 195, 204-05 (2d Cir. 2003). True, the participation clause of Title VII is applicable to an employer only when the participant against whom he is retaliating is an employee or, we now know from the *Robinson* decision, a former employee. But remember that Murphy was not only a consultant to Severn but also an executive vice-president of the company. That would almost certainly have made him an employee of Severn, employee status for purposes of Title VII and cognate laws protecting employees being determined by the principles of agency law rather than by labels. *Clackamas Gastroenterology Associates, P.C. v. Wells*, 123 S. Ct. 1673 (2003); *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696, 705 (7th Cir. 2002); *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549-52 (7th Cir. 2002); *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799, 805-06 (7th Cir. 1999); *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870, 874-77 (6th Cir. 1991). So Murphy must now be a former employee of Severn's—as in any event the company has conceded by stating in its reply brief that the EEOC can obtain a permanent injunction against its retaliating against Murphy if the Commission can prove that Severn has violated or is violating the participation clause.

The injunction is vacated and the case is remanded for further proceedings consistent with this opinion.

VACATED AND REMANDED.

No. 03-2631                                                    13

A true Copy:

　　　Teste:

　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　　　　　　*Appeals for the Seventh Circuit*