NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220478-U

NO. 4-22-0478

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 29, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| RICHARD BURNS, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Peoria County |
| AARON SCHOCK, DARIN LaHOOD, and PEORIA | ) | No. 15L203 |
| COUNTY REPUBLICAN CENTRAL COMMITTEE, | ) | |
|     Defendants | ) | Honorable |
| (Aaron Schock and Peoria County Republican Central | ) | Michael D. Risinger, |
| Committee, Defendants-Appellees). | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Harris and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding summary judgment for the defendants-appellees was appropriate because the material submitted was insufficient to establish a triable issue on the question of actual malice with respect to those defendants.

¶ 2    Plaintiff, Richard Burns, filed a complaint against defendants, Aaron Schock, Darin LaHood, and the Peoria County Republican Central Committee (Committee), seeking damages for injuries caused by the circulation of a letter containing alleged defamatory statements. Defendants moved for summary judgment. Following a hearing, the circuit court granted summary judgment for defendants, finding plaintiff, based upon the materials submitted, could not prove defendants made the alleged defamatory statements with actual malice by clear and convincing evidence. Plaintiff appeals, arguing summary judgment should not have been granted for the Committee and Schock because the material submitted was sufficient to establish a triable issue on the question of actual malice with respect to those defendants. We disagree and affirm.

¶ 3                                      I. BACKGROUND

¶ 4                              A. The 1998 Illinois State Fair

¶ 5        In 1998, Brittany Burns, the daughter of plaintiff and Colleen Callahan, showed a hog through 4-H at the Illinois State Fair. At the time, Brittany was a high school student. The hog, which Brittany raised for showing, was purchased with physical signs indicating it had been castrated and was a barrow. The hog had been shown as a barrow at several smaller fairs, and no judge in Illinois indicated the hog showed signs of cryptorchidism (having an undescended testicle). The hog won at each fair it was shown. At the 1998 Illinois State Fair, the hog won "reserve champion in the junior class for barrows" and "open champion in the barrow class (which is open to all ages, not just 4-H)." These designations authorized Brittney and her parents to solicit funds from businesses, friends, and family for raising and showing the hog. According to Brittany, the designations did not make the hog eligible for the Governor's Auction or for " 'large prize monies.' "

¶ 6        Sometime after the showing at the 1998 Illinois State Fair, there was an anonymous protest about the hog. According to Brittany, a fair employee, without notification, necropsied the hog and discovered "some type of remnant of a chord;" there was "not mention of cryptorchidism or presence of a testicle." The hog was then, without notification, destroyed. Following objection, the Illinois State Fair modified its procedures to ensure animals were not destroyed on anonymous protest without owners being notified and having an opportunity to participate in a necropsy. According to Brittany, neither she nor her parent have ever been banned from the Illinois State Fair.

¶ 7                          B. The 2008 Schock-Callahan Race for Congress

¶ 8        In 2008, Schock ran against Callahan, plaintiff's wife, for congress. At the time,

- 2 -

Steven Shearer was a campaign manager for Schock. Shearer testified he heard about the incident at the 1998 Illinois State Fair. Shearer testified:

> "The information was given to me to be able to use against her, and it was my indication—knowledge at the time that this was about her husband, and so we never did letters or mailings or anything about that at the time. But I think on blogs toward the end as they were trying to make an issue of something that [Schock's] father did and making [Schock] responsible for what his father did, I may have commented on blogs that if they wanted to make things about [Schock's] father that we may introduce things about [Callahan's] husband."

¶ 9        Also in 2008, an article entitled "Callahan says foes making issue of old state fair disqualification" was published in the *Herald-Whig*. The article states, in part, as follows:

> "Colleen Callahan said political foes are bringing up an old state fair disqualification in an effort to keep her from gaining ground in the 18th District congressional race.
>
> ***
>
> Now Callahan is denying there was any intentional effort to break the rules when her daughter showed a swine that was eventually disqualified at the Illinois State Fair 10 years ago.
>
> The swine in question was entered in the barrow class, but judges and other competitors protested that the swine had an undescended testicle, which disqualified it from competition.

Marty Lathom, who was secretary-treasurer of the Illinois Purebred Swine Council at the time, said a judge in Ohio had already given the swine low marks in a competition there and warned Callahan and her family that the animal showed signs of cryptorchidism.

That did not stop the family from entering the swine in the Illinois State Fair, where it won a championship in its class and reserve champion overall. A competitor later protested[,] and a veterinarian was called in to confirm the animal's condition.

'Colleen called up Becky Doyle, the director of agriculture, who finally decided to let the (disqualification) stand,' Lathom said.

Last week Callahan dismissed the comments as politically motivated.

'It's nothing. Period,' Callahan said. 'They want to go back to a 4-H project from 10 years ago' in an effort to affect the election.

Callahan said the protest over the swine judging was conducted in an inappropriate way, with no communication with her family. She said the protest procedures were revamped after that incident."

Shearer testified he saw the 2008 article when it was published and while he was serving as a campaign manager for Schock.

¶ 10          C. The 2014 Harding-Burns Race for Peoria County Board

¶ 11          In 2014, plaintiff ran as a Democrat for a seat on the Peoria County Board. His

opponent, Brad Harding, ran for reelection as a Republican. A few days before the election, a political advertisement in support of Harding was mailed to voters. The advertisement took the form of a two-page letter. The letter was signed by Schock, who at the time was a congressman, and LaHood, who at the time was a state senator. Although the majority of the letter was dedicated to extolling the record of Harding, the second to last paragraph of the letter addressed plaintiff:

> "Contrast this great record with that of his opponent Dick Burns. *Dick Burns has been banned by the Illinois State Fair from showing hogs because he has been caught seriously cheating to win contests with large prizes.* In this campaign Burns also has falsely claimed to have our friend Sheriff Mike McCoy's endorsement. Is that the type of individual you want watching over your tax dollars?"
>
> (Emphasis added.)

Harding later won the election.

¶ 12     D. The Commencement of a Civil Action for Damages

¶ 13     In 2015, plaintiff commenced this civil action for damages against defendants. In his complaint, plaintiff alleged claims of libel *per se* and defamation *per quod* based upon the circulation of the 2014 letter. Plaintiff specifically asserted the statements in the letter about the Illinois State Fair were false and made with actual malice. After defendants answered the complaint and generally denied liability, the parties engaged in extensive discovery concerning, amongst other things, the drafting, preparation, and mailing of the letter.

¶ 14     E. The Drafting of the 2014 Letter

¶ 15     Shearer testified he alone drafted the 2014 letter as part of his responsibilities as a volunteer vice-chairmen of the Committee. Shearer asserted the statements in the letter about the

Illinois State Fair were based upon his recollection of conversations he had with four individuals who had knowledge about the incident: (1) Brian Elsasser, a farmer, Peoria County Board member, and Republican donor; (2) Glenn Werry, a Republican donor; (3) Jesse Heimer, Schock's cousin and a hog breeder who showed hogs at competitions; and (4) a farmer whose name Shearer could not recall but who Elsasser had brought to see him. Shearer asserted the statements were also based upon his recollection of the 2008 article, which he noted was not in his possession when he drafted the letter. Shearer believed the 2008 article provided "further support" for what he had heard in the conversations with the four individuals.

¶ 16     Shearer testified he did not "remember [the] precise words" of the four individuals with whom he had spoken with about the Illinois State Fair but remembered "the facts that they told me." Shearer asserted the following facts were conveyed to him:

> "That there was a hog showing competition at the state fair in what they called barrel [*sic*] class, which are male hogs that are supposed to be castrated, and that after Dick Burns'[s] hog was shown and won that the butcher found a testicle sewed up inside of it. They gave it an unfair competition because testosterone produces better muscle tone and that the state fair subsequently after the prize was awarded disqualified Dick Burns, tried to get the money back. He fought them and that they then—the state fair banned him from showing hogs."

When asked if he was made aware of the sources of the facts conveyed to him, Shearer testified, "Several of them said that they were showing hogs at the state fair that year and they're in the hog showing business." Shearer testified Elsasser also told him he knew of two other farmers who had

knowledge about the incident but wanted to "remain confidential." Shearer asserted the "facts" conveyed to him "were consistent." When asked about his intent behind the letter, Shearer testified: "To extol Brad Harding, answer some of the criticisms that he had gotten over the past year and to put facts out there about Dick Burns."

¶ 17 Elsasser, after being asked during his 2021 deposition if he had conveyed any information to Shearer about an incident at the Illinois State Fair, testified, "You know, I had forgotten about that, but awhile back, Steve told me that I had, you know." Elsasser testified another farmer, whose name Elsasser could not recall, had also spoken with Shearer and indicated he had personal knowledge about the incident at the Illinois State Fair. When asked what information Elsasser had about the incident, Elsasser testified:

"I'm just trying to jog my memory the best—I just remember it being in the news. I mean, throughout the farming community, everybody was talking about it, that there was a—I think cryptorchid is the right word, but I'm not sure, hog that was—that Brittany had shown at the fair, and I believe she received a reserve champion or the champion. I don't even remember.

And that there was a lot of question marks that came up after the show. And the State veterinarian came in and examined the hog or whatever, and it was a cryptorchid hog. And I'm not—I don't remember whether they took away the reserve champion status or not, but there was—you know, in the farming community, it was widely known, widely talked about. And, you know, I think the conversation was that they weren't going to be able to show

anymore at the fair, but I can't remember."

When initially asked if he had any information indicating plaintiff or his wife had been banned from the Illinois State Fair, Elsasser testified, "That's what I had heard." When later asked who could prove plaintiff was banned from the Illinois State Fair, Elsasser testified, "Well, their hog was definitely disqualified, and so I think that's where the connection comes in." Elsasser acknowledged he was not at the hog show at the 1998 Illinois State Fair, and the information he had was based upon rumors he heard amongst the farming community. Elsasser recalled discussing the incident with Werry on several occasions. According to Elsasser, Werry stated "they bought a hog that was cryptorchid" and "showed the hog and probably knew about it." Elsasser also indicated Werry recently stated he was not sure if that was true.

¶ 18        Karen Disharoon, a political fundraising consultant who assisted with the preparation and mailing of the 2014 letter, testified Shearer told her the statement in the letter about plaintiff being banned from the Illinois State Fair was based upon information recycled from the 2008 Schock-Callahan race. Disharoon testified Shearer also indicated "he felt like [the information] was fully vetted in the previous campaign" and "said that he had documentation on his computer and that that computer had crashed, but he felt like we could get the documentation." Disharoon never saw any documentation but did speak with Elsasser and Charles Weaver, who at the time was a Peoria city councilman, about the allegation of plaintiff being banned. Disharoon asserted both men indicated they believed the allegation was true.

¶ 19        Weaver acknowledged speaking with Disharoon about the 1998 Illinois State Fair. Weaver asserted he did not state plaintiff had been banned from the Illinois State Fair. When asked if he indicated plaintiff showed a hog at the Illinois State Fair, Weaver testified:

        "I wouldn't have told her that because it was Brittany that

was showing the hog. It was Brittany, his daughter, that was showing the hog. Now, the reality is that, you know, a 4-H'er is responsible for their own animals, but it's very typical for parents to be very involved. And I believe Dick was involved with that hog."

Weaver indicated he was "aware of conversations where he [(plaintiff)] was actively engaged with her showing." Weaver also indicated he heard conversations about a testicle being sewn into Brittany's hog. When asked whether the reported issue with Brittany's hog could be considered cheating, Weaver testified, "If there was prior knowledge, I would say that was cheating, and I believe there was prior knowledge." Weaver explained his "impression" was "Brittany and her parents would have had knowledge of it." Weaver conveyed this information to Disharoon. Weaver testified his knowledge about the incident was based upon conversations he had with Werry, who reportedly housed the hog, and two or three other people, one of whom was actively involved in livestock.

¶ 20 Harding testified he had no recollection of discussing the 2014 letter with anyone prior to it arriving in his mailbox. When asked if he was aware of any information indicating plaintiff had been banned from the Illinois State Fair from showing hogs, Harding testified, "In the agricultural community[,] I believe this was considered common knowledge or one of the worst kept secrets around." Harding explained: "I think a more accurate statement would be that the common knowledge was that he—his family was caught cheating." Harding testified Shearer contacted him in 2017 to discuss the "vetting" process used with respect to the 2014 letter as well as Shearer's interpretation of the law related to political and campaign mailers. Harding summarized Shearer's interpretation of the law as follows:

"The threshold of accuracy for political mailings in his

opinion is different than what we would expect in everyday life and that in political mailings unfortunately sometimes candidates say wildly inaccurate things and potentially get away with that.

And he was saying in his opinion he believed the facts to be correct, again vetting them back in 2008 and vetting them in 2014. Again[,] he lamented the fact that [the Committee] and others were having to deal with this."

¶ 21                    F. Solicitation of Schock's Signature for the 2014 Letter

¶ 22          Shearer testified he solicited the signature of Schock for the 2014 letter. Shearer explained:

"I first mentioned it to him when I drove him from Peoria to the Quad Cities for a campaign event for another candidate that I was managing at the time and told him that I would like to do a joint letter to the voters extolling Brad Harding and then mentioning the information that he and I had been aware of for a number of years about Dick Burns and the hog competition at the state fair."

Shearer testified Schock agreed to sign the letter based upon that conversation and did not ask any further questions of him.

¶ 23          Schock testified about his general practice of not personally reviewing endorsement letters while he was a congressman. With respect to the letter for Harding, Schock testified he did not review the letter or discuss its contents with Shearer. Schock asserted he only discussed whether he would authorize the placement of his electronic signature on the letter, which he agreed to do. Schock explained:

"I wasn't a party to the construction of the letter, so I wouldn't even have asked him where did you get Paragraph 3 or where's the facts that—the recollection of my agreeing to this letter was will you sign an endorsement letter for Brad Harding, yes, okay, I'll take care of it, something to that effect, not here, let me go over the letter with you or—you know what I mean? So it wasn't as though—beyond me authorizing my signature to be used for an endorsement letter for Brad Harding, that was the extent of the conversation I had with [Shearer]."

Schock acknowledged hearing about "similar stories to what was in the letter" through multiple people, including Margaret Cullinan, a Republican donor, and Werry. He did not, however, recall what he heard from whom.

¶ 24 Cullinan testified she did not tell Schock anything about the 1998 Illinois State Fair and was "shocked" to hear Schock suggested otherwise. Cullinan asserted she confronted Schock about his statement, to which Schock asserted he did not remember the specifics but believed a conversation between them may have occurred at a Christmas party. Cullinan told Schock the conversation never occurred. Cullinan had no reason to believe plaintiff had been banned from the Illinois State Fair but acknowledged she had heard the rumor years earlier.

¶ 25 G. Solicitation of LaHood's Signature for the 2014 Letter

¶ 26 Shearer testified he solicited the signature of LaHood for the 2014 letter. Shearer explained he called LaHood "[a]s soon as [he] finished the draft" and then read the letter to him, disclosed to him what the statements about plaintiff were based upon, and informed him Schock had agreed to sign the letter. Shearer testified LaHood agreed to sign the letter after an in-person

meeting. Shearer asserted he was not at the meeting. Shearer believed LaHood, Disharoon, Elsasser, and Harding were present at the meeting. Shearer also believed Carol Trumpe, a Peoria County Board member who had since passed away, was also present at the meeting.

¶ 27        Disharoon testified she was at the in-person meeting concerning the 2014 letter. She asserted LaHood read the letter and asked if the statements in it were true. Disharoon informed LaHood of her belief the statements were true. Disharoon testified Elsasser also offered his comments on the statements, but she could not recall what he said. LaHood agreed to sign the letter.

¶ 28        LaHood testified either Shearer, Disharoon, or both asked him to sign the 2014 letter. He believed he first looked at the letter during an in-person meeting where Shearer, Disharoon, Elsasser, and possibly Trumpe were present. LaHood asked about the statements against plaintiff. LaHood explained:

> "So I was presented with the letter. I had not signed the letter, but I reviewed the letter and I asked—the letter—about the allegations in there and could they tell me more about the allegations and what occurred in this letter, and was told by Steve Shearer that he had all the information to back this up. He had documentation on it, that it was common knowledge this occurred, and that everything in that letter was accurate and correct."

LaHood also believed Elsasser "mentioned that he was well aware of these allegations and that they occurred, and he reassured I think everybody in the room that this in fact happened." When asked if Elsasser and Shearer specifically told him they could confirm plaintiff had been banned from the Illinois State Fair, LaHood testified, "They told me that all of the information in the letter

could be backed up and they had documentation and it was common knowledge that this had occurred." When then asked if he was shown "any documentary evidence, any documents that would relate to these assertions," LaHood testified, "So I believe Steve Shearer had said he had the documentation to prove this and to show this, but he never showed that to me." LaHood acknowledged hearing similar allegations against plaintiff during the 2008 Schock-Callahan race.

¶ 29      Elsasser testified he was at the in-person meeting concerning the 2014 letter. He did not recall if LaHood appeared in-person at the meeting. He believed Shearer, Trumpe, and Katherine Coyle, another member of the Committee, were at the meeting. When asked if he assured LaHood about the truth of the statements against plaintiff, Elsasser testified he told LaHood about the information he heard from other farmers.

¶ 30      Harding testified he was not at the in-person meeting concerning the 2014 letter. Harding indicated he spoke with Disharoon and Elsasser about the letter in 2016. Disharoon reportedly stated she, LaHood, Shearer, Elsasser, and Trumpe were at the in-person meeting, and she assured the group the allegations had been "vett[ed]" and "referred back to the 2008" Schock-Callahan race.

¶ 31                    H. Preparation and Mailing of the 2014 Letter

¶ 32      Shearer testified the Committee paid for the printing and mailing of the 2014 letter. Disharoon testified she assisted Shearer with logistics related to the letter's preparation and mailing. Shearer asserted the letter was mailed a few days before the election because Harding had not "taken up" the Committee's previous offer and Shearer wanted "to get something done for him."

¶ 33                    I. Affidavit of Billy Halstead

¶ 34      Billy Halstead, who is a longstanding chairman of the Peoria County Democratic

Party, swore he had a conversation with plaintiff about the 2014 letter. According to Halstead, plaintiff stated the allegations in the letter about him were not true. Halstead spoke with the "head judge of the State Fair" about the allegations in the letter. According to Halstead, the judge stated "no one had ever been 'kicked out' of the State Fair for the showing of animals" and, to his knowledge, plaintiff had never shown hogs.

¶ 35                              J. Summary Judgment

¶ 36          In 2022, the circuit court granted summary judgment for defendants, finding plaintiff, based upon the materials submitted, could not prove defendants made the alleged defamatory statements with actual malice by clear and convincing evidence.

¶ 37          This appeal followed.

¶ 38                              II. ANALYSIS

¶ 39          On appeal, plaintiff argues summary judgment should not have been granted for the Committee and Schock because the material submitted was sufficient to establish a triable issue on the question of actual malice with respect to those defendants. The Committee and Schock disagree.

¶ 40                              A. Standard of Review

¶ 41          The issue of whether summary judgment was appropriate is a question of law, subject to *de novo* review. *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611, ¶ 22, 957 N.E.2d 876. We consider anew the facts and the applicable law and determine whether the circuit court was correct in its rulings. *Nichols v. Certain Underwriters at Lloyd's London*, 331 Ill. App. 3d 555, 559, 771 N.E.2d 595, 598 (2002).

¶ 42                              B. Legal Standards for Summary Judgment

¶ 43          The legal standards for summary judgment are well established. Summary

judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). "A genuine issue of material fact exists 'where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts.' " *Carney v. Union Pacific Railroad Co.*, 2016 IL 118984, ¶ 25, 77 N.E.3d 1 (quoting *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49, 981 N.E.2d 951). In determining whether a genuine issue of material fact exists, the material submitted is construed "strictly against the moving party and liberally in favor of the opponent." *Id.*

¶ 44          C. Summary Judgment and the Question of Actual Malice

¶ 45          The circuit court granted summary judgment for defendants, finding plaintiff, based upon the materials submitted, could not prove defendants made the alleged defamatory statements with actual malice by clear and convincing evidence. That is, the court found summary judgment was appropriate because the material submitted was insufficient to establish a triable issue on the question of actual malice with respect to each defendant.

¶ 46          To prove any claim of defamation, a plaintiff must show "[(1)] the defendant made a false statement about the plaintiff, [(2)] the defendant made an unprivileged publication of that statement to a third party, and [(3)] that this publication caused damages." *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579, 852 N.E.2d 825, 839 (2006); see *Hardiman v. Aslam*, 2019 IL App (1st) 173196, ¶¶ 4-5, 125 N.E.3d 1185 (discussing claims of defamation *per se* and *per quod*). Where the alleged defamatory statements are made about a public figure, which includes a person who is running for public office (*Matchett v. Chicago Bar Ass'n*, 125 Ill. App. 3d 1004, 1011, 467 N.E.2d 271, 277 (1984)), first amendment protections require the plaintiff

to also prove the alleged "defamatory statements were made with actual malice." *Costello v. Capital Cities Communications, Inc.*, 125 Ill. 2d 402, 419, 532 N.E.2d 790, 797 (1988) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710, 726 (1964)); see *Maag v. Illinois Coal. for Jobs, Growth & Prosperity*, 368 Ill. App. 3d 844, 850, 858 N.E.2d 967, 973 (2006) ("When a person runs for public office, he puts his character in issue so far as it relates to his fitness and qualifications for office; therefore, his conduct and actions are fair game for comment.").

¶ 47       The actual-malice standard is a formidable one. See *Troman v. Wood*, 62 Ill. 2d 184, 195, 340 N.E.2d 292, 297 (1975) (observing "[t]he infrequency with which recovery of damages has been sustained against the objection that actual malice was not proved attests to the great difficulty facing the plaintiff in making such proof"). To establish actual malice, a plaintiff must "prove by clear and convincing evidence that the defendant published the defamatory statements with knowledge that the statements were false or with reckless disregard for their truth or falsity." *Costello*, 125 Ill. 2d at 419. Reckless disregard for the truth may be found "only where the evidence shows that the defendant in fact entertained serious doubts as to the truth of the publication." *Id.* (citing *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325 (1968)); see *Kuwik v. Starmark Star Marketing & Admin., Inc.*, 156 Ill. 2d 16, 24-25, 619 N.E.2d 129, 133 (1993) (noting reckless disregard has also been defined as publishing defamatory matter despite a high degree of awareness of its probable falsity). Recklessness, therefore, is defined in terms of the subjective state of mind of the defendant; a failure to investigate does not establish actual malice if the defendant did not seriously doubt the truth of the publication. *Costello*, 125 Ill. 2d at 419-422. Recklessness may be found " 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' " *Wanless v. Rothballer*, 115 Ill. 2d 158, 171, 503

N.E.2d 316, 321 (1986) (quoting *St. Amant*, 390 U.S. at 732).

¶ 48       The question of actual malice, as emphasized by plaintiff, is generally a matter for a trier of fact to decide. *Catalano v. Pechous*, 69 Ill. App. 3d 797, 810, 387 N.E.2d 714, 725 (1978). However, the question may, under proper circumstances, "be disposed of by a motion for summary judgment." *Pease v. International Union of Operating Engineers Local 150*, 208 Ill. App. 3d 863, 872, 567 N.E.2d 614, 620 (1991).

¶ 49       When a defendant moves for summary judgment on the question of actual malice, the relevant inquiry is whether the material submitted, viewed in the light most favorable to the plaintiff, "is such that a reasonable [trier of fact] might find that actual malice ha[s] been shown with 'convincing clarity.' " *Jacobson v. CBS Broadcasting, Inc.*, 2014 IL App (1st) 132480, ¶ 36, 19 N.E.3d 1165 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). Stated differently, the relevant inquiry is whether the material submitted, viewed in the light most favorable to the plaintiff, could support a reasonable trier of fact finding actual malice "by the clear and convincing evidence standard." *Kessler v. Zekman*, 250 Ill. App. 3d 172, 190, 620 N.E.2d 1249, 1261 (1993); see *Anderson*, 477 U.S. at 255 (stating an "appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding *** that the plaintiff has shown actual malice by clear and convincing evidence").

¶ 50                    D. Summary Judgment for the Committee

¶ 51       Plaintiff argues summary judgment should not have been granted for the Committee because the material submitted was sufficient to establish a triable issue on the question of actual malice. In support of his argument, plaintiff highlights (1) Shearer's "possession [of the 2008 article] that directly and unequivocally contradicted everything that he put in the campaign letter," (2) Elsasser's testimony failing to provide support for all of the statements Shearer made about

plaintiff in the letter, and (3) the testimony from LaHood and Disharoon indicating Shearer asserted he could prove the allegations and had supporting documentation but then never showed them the documentation.

¶ 52 The Committee, in response, maintains the material submitted was insufficient to establish a triable issue on the question of actual malice and, therefore, summary judgment for it was appropriate. Specifically, the Committee contends the evidence highlighted by plaintiff is insufficient to establish a triable issue on the question of whether Shearer had actual knowledge of the alleged falsity of the statements against plaintiff or published the statements with a reckless disregard for the truth.

¶ 53 Shearer testified he alone drafted the 2014 letter as part of his responsibilities as a volunteer vice-chairmen of the Committee. Shearer asserted the statements he wrote about plaintiff in the letter were based upon his recollection of the conversations he had and the article he read in 2008. Shearer explained some of the conversations occurred with individuals who showed hogs at the 1998 Illinois State Fair and were in the hog-showing business. Shearer also explained the facts conveyed to him during the conversations were "consistent" and supported by his recollection of the 2008 article. Shearer expressed no doubts about the truthfulness of the statements he wrote about plaintiff—he asserted a purpose of the letter was "to put facts out there about Dick Burns."

¶ 54 To contest Shearer's testimony and raise an issue of material fact as to whether Shearer knew the statements were false or acted with reckless disregard for their truth, plaintiff relies upon Shearer's "possession [of the 2008 article] that directly and unequivocally contradicted everything that he put in the campaign letter." The 2008 article does not, however, directly and unequivocally contradict the statements made about plaintiff. To the contrary, the 2008 article provides support, as Shearer had testified to, for what Shearer had heard in conversations.

Specifically, the article indicated an Ohio judge had previously "warned Callahan and her family that the animal showed signs of cryptorchidism," and the warning "did not stop the family from entering the swine in the Illinois State Fair, where it won a championship in its class and reserve champion overall." While the article does not mention plaintiff by name or support every statement made about plaintiff, it referenced the "family" and other information Shearer had heard in conversations.

¶ 55　　　　Plaintiff also relies upon Elsasser's testimony failing to provide support for all of the statements made about plaintiff. The information provided by Elsasser was not, however, the only information upon which Shearer relied when drafting the statements. Shearer also relied upon information provided by two other named individuals, Werry and Heimer. Plaintiff, seemingly recognizing the statements could have been based upon information offered by those two individuals, asserts in his reply brief, "[Werry] was not deposed in this case because of allegations that he was not mentally competent[,] and [Heimer], a cousin of [Schock], lives in Missouri and was not available to testify, nor was Heimer tendered by the [d]efendants." Absent from this assertion is any citation to the record or citation to supporting legal authority. See *Hobby Lobby Stores, Inc. v. Sommerville*, 2021 IL App (2d) 190362, ¶ 41, 186 N.E.3d 67 ("Parties must support their arguments in this court with appropriate citations of the record and pertinent legal authority."). We are without a sufficient explanation for the absence of testimony or other evidence from these individuals.

¶ 56　　　　Plaintiff further relies upon testimony from LaHood and Disharoon indicating Shearer asserted he could prove the allegations and had supporting documentation but then never showed them the documentation. There is nothing to suggest, however, LaHood or Disharoon asked to see the documentation, which Shearer then withheld. Again, Shearer explained the

statements about plaintiff were based upon his recollection of conversations he had and the article he read in 2008. He maintained the article provided "further support" for what he had heard in the conversations with the four individuals. Indeed, LaHood indicated he was assured the statements in the letter were accurate based upon "common knowledge this occurred."

¶ 57   This court, after considering the material submitted in the light most favorable to plaintiff, is not convinced a reasonable trier of fact could find actual malice by clear and convincing evidence. Accordingly, we conclude summary judgment for the Committee was appropriate because the material submitted was insufficient to establish a triable issue on the question of actual malice.

¶ 58         E. Summary Judgment for Schock

¶ 59   Plaintiff argues summary judgment should not have been granted for Schock because the material submitted was sufficient to establish a triable issue on the question of actual malice. In support of his argument, plaintiff highlights (1) Shearer's testimony indicating he told Schock he planned to "mention[ ] [in the letter] the information that [they] had been aware of for a number of years about [plaintiff] and the hog competition at the state fair," (2) Schock's "obvious[ ]" knowledge of the 2008 article, and (3) Cullinan's testimony disputing Schock's testimony indicating she told him anything about the incident at the 1998 Illinois State Fair.

¶ 60   Schock, in response, maintains the material submitted was insufficient to establish a triable issue on the question of actual malice and, therefore, summary judgment for him was appropriate. Specifically, Schock contends the undisputed evidence showing he was not aware of any specific statement in the 2014 letter when it was published precludes a finding of actual malice. In support of that contention, Schock cites, *inter alia*, *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977) (finding the plaintiff failed to produce sufficient evidence to show

the newspaper editor acted with actual malice where it was "undisputed that he did not read the article in question prior to its publication"), and *Landry v. Roberson Advertising Service, Inc.*, 660 So. 2d 194, 198 (La. App. 4th Cir. 1995) (finding the plaintiff failed to produce sufficient evidence to show the political candidate acted with actual malice where the candidate "denied any knowledge" of the ad in question and there had been no showing he "personally prepared the ad, directed its publication or knew its allegations to be false").

¶ 61 In reply, plaintiff "does not dispute the cases cited by [Schock] that in some cases and under some circumstances, a party may be dismissed from a case where they did not read or were not aware of the contents of a letter." Plaintiff asserts, however, "this case is far different," noting the evidence he highlighted in support of his argument.

¶ 62 Schock testified to having no knowledge of any specific statement in the letter when it was published. Schock asserted he did not review the letter or discuss its content with Shearer; he simply agreed to having his signature affixed to the letter. Plaintiff does not identify anything from the material submitted to contest this testimony. To be sure, the material submitted, viewed in the light most favorable to plaintiff, does show Schock was aware of the alleged incident at the 1998 State Fair and the fact it was going to be mentioned in the 2014 letter. This court is not convinced, however, that such general knowledge, by itself, can support a reasonable trier of fact finding actual malice under the clear and convincing evidence standard. Accordingly, we conclude summary judgment for Schock was appropriate because the material submitted was insufficient to establish a triable issue on the question of actual malice.

¶ 63 F. Final Comment

¶ 64 Before concluding, we emphasize the outcome in this case has turned on whether the material presented was sufficient to create a triable issue on the question of actual malice. As

such, neither this court nor the circuit court reached the underlying truth or falsity of the statements made about plaintiff. This disposition should not be construed as providing any opinion on the truth or falsity of those allegations.

¶ 65                              III. CONCLUSION

¶ 66          We affirm the circuit court's judgment.

¶ 67          Affirmed.